# IN THE SUPREME COURT OF TEXAS

══════════
No. 12-0657
══════════


ASHISH PATEL, ANVERALI SATANI, NAZIRA MOMIN, MINAZ CHAMADIA,
AND VIJAY LAKSHMI YOGI, PETITIONERS/CROSS-RESPONDENTS,

v.

TEXAS DEPARTMENT OF LICENSING AND REGULATION, ET AL.,
RESPONDENTS/CROSS-PETITIONERS

══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
══════════════════════════════════════════════

**Argued February 27, 2014**


JUSTICE JOHNSON delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE WILLETT, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

JUSTICE WILLETT filed a concurring opinion, in which JUSTICE LEHRMANN and JUSTICE DEVINE joined.

JUSTICE BOYD filed a concurring opinion.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GUZMAN and JUSTICE BROWN joined.

JUSTICE GUZMAN filed a dissenting opinion.


In this declaratory judgment action several individuals practicing commercial eyebrow threading and the salon owners employing them assert that, as applied to them, Texas's licensing statutes and regulations violate the Texas Constitution's due course of law provision. They claim

that most of the 750 hours of training Texas requires for a license to practice commercial eyebrow threading are not related to health and safety or what threaders actually do. The State concedes that over 40% of the required hours are unrelated, but maintains that the licensing requirements are nevertheless constitutional.

The trial court and court of appeals agreed with the State. We do not. We reverse and remand to the trial court for further proceedings.

## I. Background

Eyebrow threading is a grooming practice mainly performed in South Asian and Middle Eastern communities. It involves the removal of eyebrow hair and shaping of eyebrows with cotton thread. "Threading," as it is most commonly known, is increasingly practiced in Texas on a commercial basis. Threaders tightly wind a single strand of cotton thread, form a loop in it with their fingers, tighten the loop, and then quickly brush the thread along the skin of the client, trapping unwanted hair in the loop and removing it. Commercial threading became regulated in Texas when the Legislature categorized it as a practice of "cosmetology." *See* TEX. OCC. CODE § 1602.002(a)(8) ("'[C]osmetology' means the practice of performing or offering to perform for compensation . . . [the] remov[al] [of] superfluous hair from a person's body using depilatories, preparations, or tweezing techniques . . . ."). That categorization and its effects underlie this case.

In order to legally practice cosmetology in Texas a person must hold either a general operator's license or, in certain instances, a more limited but easier-to-obtain esthetician license. *Id.* § 1602.251(a). Licensing requirements for general operators include completing a minimum of 1,500 hours of instruction in a licensed beauty culture school and passing a state-mandated test. *Id.*

2

§ 1602.254; 16 TEX. ADMIN. CODE § 83.20(a). Requirements for an esthetician license include completing a minimum of 750 hours of instruction in an approved training program and passing a state-mandated test. TEX. OCC. CODE § 1602.257(b); 16 TEX. ADMIN. CODE § 83.20(b). Commercial eyebrow threaders must have at least an esthetician license. *See* TEX. OCC. CODE §§ 1602.002(a)(8), .257; *see also* 16 TEX. ADMIN. CODE § 83.10(36).

The Texas Department of Licensing and Regulation (TDLR or the Department), which is governed by the Texas Commission of Licensing and Regulation (the Commission), is charged with overseeing individuals and businesses that offer cosmetology services. TEX. OCC. CODE §§ 51.051, .201(a), 1602.001–.002, 1603.001–.456. The executive director of TDLR is authorized to impose administrative fines of as much as $5,000 per violation, per day. *See id.* §§ 51.302, 1602.251.

In late 2008 and early 2009, TDLR inspected Justringz—a threading business with kiosk locations in malls across Texas—and found Nazira Nasruddin Momin and Vijay Lakshmi Yogi performing eyebrow threading without licenses. TDLR issued Notices of Alleged Violations to them for the unlicensed practice of cosmetology. Minaz Chamadia was also performing threading at Justringz without a license, but she was not cited by TDLR. The administrative hearings and fines pending against Momin and Yogi have been stayed pursuant to a Rule 11 Agreement. *See* TEX. R. CIV. P. 11.

Ashish Patel and Anverali Satani own threading salons named Perfect Browz. The State has not taken any administrative action related to Perfect Browz. Satani is the sole owner of another threading business, Browz and Henna. TDLR inspected and investigated Browz and Henna on the basis of complaints filed against it. Although Satani received two warnings for Browz and Henna

3

employing unlicensed threaders, the Department did not issue a Notice of Alleged Violation. Like the proceedings against Momin and Yogi, prosecution of Browz and Henna has been stayed by agreement of the parties.

In December 2009, Patel, Satani, Momin, Chamadia, and Yogi (collectively, the Threaders) brought suit against TDLR, its executive director, the Commission, and the Commission's members (collectively, the State) pursuant to the Uniform Declaratory Judgments Act (UDJA) seeking declaratory and injunctive relief. *See* TEX. CIV. PRAC. & REM. CODE §§ 37.001–.004, .006, .010. The Threaders alleged that the cosmetology statutes and administrative rules issued pursuant to those statutes (collectively, the cosmetology scheme) were unreasonable as applied to eyebrow threading and violated their constitutional right "to earn an honest living in the occupation of one's choice free from unreasonable governmental interference." They specifically sought declaratory judgment that, as applied to them, the cosmetology statutes and associated regulations violate the privileges and immunities and due course guarantees of Article I, § 19 of the Texas Constitution. They also sought a permanent injunction barring the State from enforcing the cosmetology scheme relating to the commercial practice of eyebrow threading against them.

The Threaders moved for summary judgment, contending that "application of the state's cosmetology laws and administrative rules to the commercial practice of eyebrow threading is unconstitutional because it places senseless burdens on eyebrow threaders and threading businesses without any actual benefit to public health and safety." The motion urged that the State could not constitutionally regulate the commercial practice of eyebrow threading as conventional cosmetology unless it could establish a real and substantial relationship between the statutes and regulations and

the public's health and safety, and the State could not meet this standard. The State filed both a plea to the jurisdiction and a traditional motion for summary judgment. By its plea to the jurisdiction, the State challenged the Threaders' standing, contending that their claims were barred by sovereign immunity and the redundant remedies doctrine. In its motion for summary judgment, the State asserted that the Threaders failed to show that Texas's regulation of the practice of eyebrow threading deprived the Threaders of any substantive due process right protected by Article I, § 19 or to plead a privileges and immunities claim different from their substantive due process claim.

The district court denied the State's plea to the jurisdiction, granted its motion for summary judgment, and denied the Threaders' motion for summary judgment. Both parties appealed.

The court of appeals affirmed. *Patel v. Tex. Dep't of Licensing & Regulation*, ___ S.W.3d ___ (Tex. App.—Austin 2012). As to the State's jurisdictional issues, the court held that the Threaders' suit was not barred by sovereign immunity or the redundant remedies doctrine, the Threaders had standing, and their claims were ripe. *Id.* at ___. As to the merits, the appeals court concluded that under either the real and substantial or rational basis test, the State established that the challenged cosmetology scheme, as applied to the Threaders, does not violate Article I, § 19. *Id.* at ___.

In this Court the Threaders argue that (1) the real and substantial test governs substantive due process challenges to statutes and regulations affecting economic interests when the challenges are brought under Article I, § 19 of the Texas Constitution; (2) the cosmetology statutes and rules are unconstitutional as applied to the Threaders because they have no real and substantial connection to a legitimate governmental objective; and (3) even if rational basis review is the correct

5

constitutional test, under the appropriate test, the statutes and regulations are unconstitutional as applied to the Threaders.

The State contends that (1) it is immune from declaratory judgment claims raising constitutional challenges to statutes; (2) the Threaders' claims lack both justiciability and ripeness; (3) the claims are barred by the redundant remedies doctrine; (4) the business owners lack standing; (5) there is no real difference between the "real and substantial" and "rational relationship" tests for due process concerns; and (6) threading raises public health concerns, implicating valid governmental concerns, thus the challenged licensing statutes and regulations that address these concerns comport with the substantive due process requirements regardless of which test is applied.[1]

We address the arguments in turn, necessarily beginning with the jurisdictional issues the State raises. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) (noting that if a court does not have jurisdiction, its opinion addressing any issues other than jurisdiction is advisory).

---

[1] *Amicus curiae* briefs have been submitted by the Pacific Legal Foundation (in support of the Threaders); Houston Belt & Terminal Railway Co., BNSF Railway Co., and Union Pacific Railway Co.; and South Texas College of Law 2014 State Constitutional Law Class (not submitted in support of either party).

## II. Jurisdiction

### A. Sovereign Immunity

Sovereign immunity implicates a trial court's jurisdiction, and, when it applies, precludes suit against a governmental entity. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). The State acknowledges this Court's decisions to the effect that sovereign immunity is inapplicable when a suit challenges the constitutionality of a statute and seeks only equitable relief. *See City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (concluding "that the appeals court did not err by refusing to dismiss the plaintiffs' claims [against the city] for injunctive relief on alleged constitutional violations"); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) (determining that a plaintiff whose constitutional rights have been violated may sue the State for equitable relief). But referencing *Texas Department of Insurance v. Reconveyance Services, Inc.*, 306 S.W.3d 256, 258-59 (Tex. 2010), and *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370-72 (Tex. 2009), the State argues that our more recent decisions indicate that we may be departing from that rule. We are not.

In *Heinrich* we decided that sovereign immunity does not prohibit suits brought to require state officials to comply with statutory or constitutional provisions. 284 S.W.3d at 372. But, to fall within this "ultra vires exception," a suit must allege that a state official acted without legal authority or failed to perform a purely ministerial act, rather than attack the officer's exercise of discretion. *Id.* The governmental entities themselves remain immune from suit, though, because unlawful acts of officials are not acts of the State. *Id.* at 372-73. Thus, we concluded that suits complaining of

ultra vires actions may not be brought against a governmental unit, but must be brought against the allegedly responsible government actor in his official capacity. *Id.* at 373.

We reconfirmed the point in *Reconveyance*, where we held that the trial court lacked jurisdiction to hear a suit against the Texas Department of Insurance. 306 S.W.3d at 258-59. We concluded that the claims were substantively ultra vires claims because the pleadings alleged the Department of Insurance had acted beyond its statutory authority. *Id.* That being so, the claims should have been brought against the appropriate state officials in their official capacities. *Id.*

In this case, the Threaders did not plead that the Department and Commission officials exceeded the authority granted to them; rather, they challenged the constitutionality of the cosmetology statutes and regulations on which the officials based their actions. The State proposes that an official can act ultra vires either by acting inconsistently with a constitutional statute or by acting consistently with an unconstitutional one. It urges that the Threaders' claims fall within the "acting consistently with an unconstitutional statute" category. But the premise underlying the ultra vires exception is that the State is not responsible for unlawful acts of officials. *Heinrich*, 284 S.W.3d at 372. The State's proposal would effectively immunize it from suits claiming a statute is unconstitutional—an illogical extension of that underlying premise.

Contrary to the State's position, *Heinrich* and *Reconveyance* do not represent a departure from the rule that sovereign immunity is inapplicable in a suit against a governmental entity that challenges the constitutionality of a statute and seeks only equitable relief. *See id.* at 373 n.6. To the contrary, in *Heinrich* we clarified that "[f]or claims challenging the validity of . . . statutes . . . the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and

8

thereby waives immunity." *Id.* (citing *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)). And we have reiterated the principle more recently. *See Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621-22 & n.3 (Tex. 2011) (restating that state entities can be—and in some instances such as when the constitutionality of a statute is at issue, must be—parties to challenges under the UDJA); *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 634 (Tex. 2010) (holding that allegations against the lottery commissioner were not ultra vires allegations because the claim challenged a statute and was not one involving a government officer's action or inaction). Accordingly, because the Threaders challenge the validity of the cosmetology statutes and regulations, rather than complaining that officials illegally acted or failed to act, the ultra vires exception does not apply. The Department and the Commission are not immune from the Threaders' suit.

## B. Viability

Next, the State contends that the officials are immune from suit because the Threaders had to prove their claims in order to survive a plea to the jurisdiction. *See Heinrich*, 284 S.W.3d at 372 ("To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."). The State argues that because the trial court granted summary judgment to the State on the merits, the Threaders did not prove a valid claim, rendering their pleadings insufficient to give the trial court jurisdiction. The State relies on *Andrade v. NAACP of Austin*, in which we held that the Secretary of State was immune from suit because the constitutional claims against her were non-viable. 345 S.W.3d 1, 6, 11-12, 18 (Tex.

9

2011). But, our conclusion there simply followed a line of decisions in which we held that claims were not viable due to basic pleading defects. *Id.* at 13-14. *Andrade* stands for the unremarkable principle that claims against state officials—like all claims—must be properly pleaded in order to be maintained, not that such claims must be viable on their merits to negate immunity. *Id.* Because the Threaders' pleadings presented a viable claim, they were sufficient.

## C. Justiciability

Next, the State employs the doctrines of standing, ripeness, and redundant remedies to argue that the courts below, and this Court, lack jurisdiction because the claims of the Threaders are not justiciable. We consider each doctrine in turn.

### 1. Standing

The standing doctrine identifies suits appropriate for judicial resolution. *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001). Standing assures there is a real controversy between the parties that will be determined by the judicial declaration sought. *Id.* (quoting *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 517-18 (Tex. 1995)). "[T]o challenge a statute, a plaintiff must [both] suffer some actual or threatened restriction under the statute" and "contend that the statute unconstitutionally restricts the plaintiff's rights." *Garcia*, 893 S.W.2d at 518. The State argues that Patel and Satani—whose claims are based solely on their status as threading salon owners—lack standing because they fail both prongs of the standing test.

Generally, courts must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 152 (Tex. 2012). However, "where there are multiple plaintiffs in a case, who seek injunctive or declaratory relief (or

10

both), who sue individually, and who all seek the same relief[,] . . . the court need not analyze the standing of more than one plaintiff—so long as that plaintiff has standing to pursue as much or more relief than any of the other plaintiffs." *Id.* at 152 n.64. The reasoning is fairly simple: if one plaintiff prevails on the merits, the same prospective relief will issue regardless of the standing of the other plaintiffs. *Id.*; *see also Andrade*, 345 S.W.3d at 6 ("Because the voters seek only declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required.").

Here, Momin and Yogi, the threaders who received Notices of Alleged Violation, have standing, and the State does not contend otherwise. First, they have suffered some actual restriction under the challenged statute because TDLR initiated regulatory proceedings against each of them pursuant to their alleged violations of the Texas cosmetology statutes and regulations. And second, they are contending that the statute unconstitutionally restricts their rights to practice eyebrow threading. Accordingly, because Momin and Yogi have standing, we need not analyze the standing of Patel and Satani.

The State also argues that because the Threaders seek attorneys' fees, the relief ultimately awarded will not necessarily be identical. But standing is determined at the beginning of a case, and whether the relief ultimately granted is the same for all parties is not determinative of the question. Here, Momin and Yogi have standing to seek relief and that is all we need to determine. *See Andrade*, 345 S.W.3d at 6-11; *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 626-27 (Tex. 1996); *Garcia*, 893 S.W.2d at 518-19.

## 2. Ripeness

The State next argues that the claims brought by Patel, Satani, and Chamadia are not ripe because Patel, Satani, and Chamadia have not faced administrative enforcement. We disagree.

Under the ripeness doctrine, courts must "consider whether, *at the time a lawsuit is filed*, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851-52 (Tex. 2000) (emphasis in original) (citations omitted). Thus, the ripeness analysis focuses on whether a case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all. *Id.* at 852.

Here, although Patel, Satani, and Chamadia have not yet faced administrative enforcement, the threat of harm is more than conjectural, hypothetical, or remote. Satani's business, Browz and Henna, has received two warnings for employing unlicensed threaders, and he has been referred to TDLR's legal department for enforcement. Patel and Satani risk $5,000 in penalties daily for employing unlicensed threaders. TEX. OCC. CODE §§ 51.302(a), 1602.403(c)(1). And Chamadia works at the same threading salon where Momin and Yogi were cited. Because at the time the lawsuit was filed Chamadia was performing threading services without a cosmetology license and Patel and Satani were employing threaders who did not have cosmetology licenses, these individuals were subject to a real threat of likely civil and criminal proceedings, as well as administrative proceedings that could result in penalties and sanctions. *See Mitz v. Tex. State Bd. of Veterinary Med. Exam'rs*, 278 S.W.3d 17, 26 (Tex. App.—Austin 2008, pet. dism'd by agr.) (holding that a

constitutional challenge to a state-licensing law is ripe when enforcement of the law is "sufficiently likely" to occur). Therefore, their claims are ripe.

### 3. Redundant Remedies

The State also seeks to dismiss the claims of the Threaders who have received citations based on the redundant remedies doctrine. Under the redundant remedies doctrine, courts will not entertain an action brought under the UDJA when the same claim could be pursued through different channels. *See, e.g.*, *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 200 (Tex. 2007). The focus of the doctrine is on the initiation of the case, that is, whether the Legislature created a statutory waiver of sovereign immunity that permits the parties to raise their claims through some avenue other than the UDJA. *See, e.g.*, *Aaron Rents, Inc. v. Travis Cent. Appraisal Dist.*, 212 S.W.3d 665, 669 (Tex. App.—Austin 2006, no pet.) (en banc) ("When a statute provides an avenue for attacking an agency order, a declaratory judgment action will not lie to provide redundant remedies."); *see also Alamo Express, Inc. v. Union City Transfer*, 309 S.W.2d 815, 827 (Tex. 1958) (holding "an action for declaratory judgment does not lie" in a suit that asserts a "direct attack upon the [agency's] order by appeal").

The State maintains that the Legislature has provided Momin and Yogi two alternative avenues under the Administrative Procedures Act (APA): (1) a suit for judicial review alleging that the administrative decision was "in violation of a constitutional or statutory provision," TEX. GOV'T CODE § 2001.174(2)(A); or (2) a suit for a pre-enforcement declaratory judgment alleging "that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." *Id.* § 2001.038(a). The State contends that because either

13

of those APA provisions permits Yogi and Momin to file suits that would redress their alleged injuries, they may not pursue relief under the UDJA.

We disagree with the State's assertion that a favorable decision under Section 2001.174 of the APA—authorizing courts to review administrative decisions—would obviate the need for the relief the Threaders seek. *See id.* § 2001.174 (allowing state courts to reverse or remand existing agency orders, but not enjoin future ones). The available remedies on appeal from an administrative finding are limited to reversal of the particular orders at issue. *Id.* But the Threaders seek more than a reversal of the citations issued to Momin and Yogi. They seek prospective injunctive relief against future agency orders based on the statutes and regulations. Accordingly, because the declaration sought goes beyond reversal of an agency order, Section 2001.174 of the APA does not provide a redundant remedy.

The State's contention that Section 2001.038 of the APA creates an avenue for pre-enforcement declaratory judgment that an agency rule is invalid and would redress the Threaders' alleged injuries is likewise unavailing. When a plaintiff files a proceeding that only challenges the validity of an administrative rule, the parties are bound by the APA and may not seek relief under the UDJA because such relief would be redundant. *See Leeper*, 893 S.W.2d at 443-44. The APA defines a rule as:

> (A)  . . . a state agency statement of general applicability that:
> (i) implements, interprets, or prescribes law or policy; or
> (ii) describes the procedure or practice requirements of a state agency;
>
> (B)  includ[ing] the amendment or repeal of a prior rule; and

14

(C)      . . . not includ[ing] a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

TEX. GOV'T CODE § 2001.003(6). Here the Threaders challenge both rules as defined by the APA and statutes. Because the Threaders cannot attack the constitutionality of the statutes pursuant to Section 2001.038 of the APA, their UDJA claims are not barred by the redundant remedies doctrine.

Having concluded that the lower courts had jurisdiction, we turn to the merits.

## III. Constitutionality of the Statutes and Regulations

### A. Due Course of Law

Article I, § 19 of the Texas Constitution provides that

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

TEX. CONST. art. I, § 19.

We have at least twice noted that Texas courts have not been entirely consistent in the standard of review applied when economic legislation is challenged under Section 19's substantive due course of law protections. *See Trinity River Auth. v. URS Consultants, Inc.—Tex.*, 889 S.W.2d 259, 263 & n.5 (Tex. 1994); *Garcia*, 893 S.W.2d at 525. The Threaders go beyond those two cases. They assert that courts considering as-applied substantive due process challenges under Section 19 have mixed and matched three different standards of review through the years. They label those standards as: (1) real and substantial, (2) rational basis including consideration of evidence, and (3) no-evidence rational basis.

15

The Threaders argue that the first referenced standard—"real and substantial"—is exemplified by cases such as *State v. Richards*, 301 S.W.2d 597 (Tex. 1957); *Aladdin's Castle, Inc. v. City of Mesquite*, 713 F.2d 137, 138 n.2 (5th Cir.1983) (applying Texas law); *Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 215 (Tex. App.—Austin 2008, no pet.); *Texas State Board of Pharmacy v. Gibson's Discount Center, Inc.*, 541 S.W.2d 884, 887-89 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.); *City of Houston v. Johnny Frank's Auto Parts Co.*, 480 S.W.2d 774, 779 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Humble Oil & Refining Co. v. City of Georgetown*, 428 S.W.2d 405, 407-08 (Tex. Civ. App.—Austin 1968, no writ); and *City of Coleman v. Rhone*, 222 S.W.2d 646, 649 (Tex. Civ. App.—Eastland 1949, writ ref'd). They interpret this standard as one in which the reviewing court considers whether (1) the legislative purpose for the statute is a proper one, (2) there is a real and substantial connection between that purpose and the language of the statute as the statute functions in practice, and (3) the statute works an excessive or undue burden on the person challenging the statute in relation to the statutory purpose. They argue that the distinguishing characteristic of cases employing the standard is that the courts using it consider evidence concerning both the government's purpose for a law and the law's real-world impact on the challenging party.

The Threaders recognize that the real and substantial test affords less deference to legislative judgments than does the federal rational basis standard. But they point to *In the Interest of J.W.T.*, 872 S.W.2d 189, 197-98 & n.23 (Tex. 1994); *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex. 1992); and *LeCroy v. Hanlon*, 713 S.W.2d 335, 338-41 (Tex. 1986), as examples of cases in which this Court specifically said or implied that certain language in the Texas Constitution affords more

protection than comparable text in the federal Constitution. They also reference the United States

Supreme Court as having noted in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293

(1982), that Article I, § 19 of the Texas Constitution might afford more protections than does the

Fourteenth Amendment. They claim that twenty other states utilize the "real and substantial" test.[2]

The Threaders present the second standard—"rational basis including consideration of

evidence"—as being exemplified by cases such as *City of San Antonio v. TPLP Office Park*

---

[2] The Threaders cite the following to support their position: *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946-48 & n.7 (Pa. 2004) (upholding auctioneer regulations designed to prevent fraud); *OMYA, Inc. v. Town of Middlebury*, 758 A.2d 777, 780 (Vt. 2000) (upholding commercial traffic limits that reduced congestion, pollution, and property damage); *Peppies Courtesy Cab Co. v. City of Kenosha*, 475 N.W.2d 156, 158-59 (Wis. 1991) (striking down taxicab dress code because it lacked a substantial relation to improving city's public image); *Katz v. S.D. State Bd. of Med. & Osteopathic Exam'rs*, 432 N.W.2d 274, 278-79 & n.6 (S.D. 1988) (upholding medical-practice regulations designed to prevent malpractice and fraud); *Louis Finocchiaro, Inc. v. Neb. Liquor Control Comm'n*, 351 N.W.2d 701, 704-06 (Neb. 1984) (striking down liquor wholesale price controls because they lacked any substantial relationship to public welfare); *Myrick v. Bd. of Pierce Cnty. Comm'rs*, 677 P.2d 140, 143-47 (Wash. 1984) (en banc), *amended by* 687 P.2d 1152 (striking down most provisions of massage parlor regulations); *Red River Constr. Co. v. City of Norman*, 624 P.2d 1064, 1067 (Okla. 1981) (striking down municipal ordinance prohibiting sand trucks from using certain streets because the ordinance actually increased traffic and the risk of accidents); *Rockdale Cnty. v. Mitchell's Used Auto Parts, Inc.*, 254 S.E.2d 846, 847 (Ga. 1979) (reversing lower court ruling that zoning requirements were facially unconstitutional, but remanding to allow the plaintiff to show that the requirements had no real and substantial relationship to public health and safety); *In re Fla. Bar*, 349 So. 2d 630, 634-35 (Fla. 1977) (per curiam) (rejecting maximum contingency-fee schedule that failed to meaningfully address problem of excessive fees); *McAvoy v. H.B. Sherman Co.*, 258 N.W.2d 414, 422, 427-29 (Mich. 1977) (upholding law requiring employers to pay 70% of workers' compensation award while appeal of the award was pending); *Dep't for Natural Res. & Envtl. Prot. v. No. 8 Ltd. of Va.*, 528 S.W.2d 684, 686-87 (Ky. 1975) (striking down law that conditioned the grant of strip-mining permits on obtaining the surface owner's consent because it was ineffective as an environmental-protection measure); *Hand v. H & R Block, Inc.*, 528 S.W.2d 916, 923 (Ark. 1975) (striking down minimum price for franchise agreements because it bore no relation to public health and safety); *Leetham v. McGinn*, 524 P.2d 323, 325 (Utah 1974) (striking down law restricting cosmetologists to women's hair); *Md. State Bd. of Barber Exam'rs v. Kuhn*, 312 A.2d 216, 224-25 (Md. 1973) (same); *Colo ex rel. Orcutt v. Instantwhip Denver, Inc.*, 490 P.2d 940, 943-45 (Colo. 1971) (striking down ban on so-called "filled milk" products because the ban bore no relationship to protecting public safety or preventing fraud); *Brennan v. Ill. Racing Bd.*, 247 N.E.2d 881, 882-84 (Ill. 1969) (striking down regulation that conditioned a horse trainer's license on his horses' drug-testing results); *Coffee-Rich, Inc. v. Comm'r of Pub. Health*, 204 N.E.2d 281, 286-89 (Mass. 1965) (striking down law banning the sale of imitation coffee cream because the law did not prevent fraud or market confusion); *Zale-Las Vegas, Inc. v. Bulova Watch Co.*, 396 P.2d 683, 691-93 (Nev. 1964) (striking down law that bound third parties to non-compete provisions in private contracts because the law did not promote competition); *Berry v. Koehler*, 369 P.2d 1010, 1014-15 (Idaho 1961) (upholding regulation of dental prosthetics as licensed dentistry because licensure meaningfully protected the public); *Christian v. La Forge*, 242 P.2d 797, 804 (Or. 1952) (en banc) (striking down fixed barbering prices because they only benefitted barbers, not the public).

17

*Properties, L.P.*, 218 S.W.3d 60, 65-66 (Tex. 2007); *Garcia*, 893 S.W.2d at 525-26; *Limon v. State*, 947 S.W.2d 620, 627-29 (Tex. App.—Austin 1997, no writ); and *Martin v. Wholesome Dairy, Inc.*, 437 S.W.2d 586, 590-600 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.). Courts applying this test, the Threaders posit, lean heavily on the federal rational basis test and often weigh evidence—including expert testimony—to determine the purpose of a law and whether the law enacted to effect that purpose is reasonable.

The Threaders reference the third standard as "no evidence rational basis," which they say is embodied in cases such as *Barshop*, 925 S.W.2d at 625, 632-33; *Garcia v. Kubosh*, 377 S.W.3d 89, 98-100 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Lens Express v. Ewald*, 907 S.W.2d 64 (Tex. App.—Austin 1995, no writ); and *Texas Optometry Board v. Lee Vision Center, Inc.*, 515 S.W.2d 380, 385-86 (Tex. Civ. App.—Eastland 1974, writ ref'd n.r.e.). Under the no-evidence version of the rational basis test, they argue, economic regulations do not violate Section 19 if they have any conceivable justification in a legitimate state interest, regardless of whether the justification is advanced by the government or "invented" by the reviewing court, and evidence "seldom" matters.

The Threaders say both the "real and substantial" and "rational basis including consideration of evidence" standards have two prongs, with the first being the primary difference between them. The first prong of the real and substantial standard, they maintain, is whether the challenged statute or regulation has a real and substantial connection to a legitimate governmental objective. They contrast that test with the rational basis including consideration of evidence standard, which they argue is more lenient and favorable toward the government because it asks only whether a statute or regulation arguably *could* bear some rational relationship to a legitimate governmental objective.

18

They further maintain that for both standards the second prong is whether, on balance, the challenged statute or rule imposes an arbitrary or unduly harsh burden on the challenger in light of the government's objective.

In light of the parties' contentions, we first briefly review the history of the due course of law language in Article I, § 19.

## B. Development of the Standard

The Declaration of Rights of the 1836 Republic of Texas Constitution included three separate rights guaranteeing "due course of law" or the "due course of the law of the land": (1) the sixth, which (among other protections) prevented an accused in a criminal proceeding from being "deprived of life, liberty, or property, but by due course of law"; (2) the eleventh, which provided that an injured person "shall have remedy by due course of law"; and (3) the seventh, which provided that "[n]o citizen shall be deprived of privileges, outlawed, exiled, or in any manner disenfranchised, except by due course of the law of the land." REP. OF TEX. CONST. OF 1836, Declaration of Rights 6-7, 11, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 1083 (Austin, Gammel Book Co. 1898).

In 1845, a group of delegates met to draft and propose Texas's first state constitution. The committee responsible for drafting the Bill of Rights proposed including two due course of law clauses—not the three clauses in the Declaration of Rights of the 1836 Republic of Texas Constitution. Comm. on Bill of Rights & Gen. Provisions, *Journals of the Convention, Assembled at the City of Austin on the Fourth of July, 1845, for the Purpose of Framing a Constitution for the State of Texas*, *assembled* July 11, 1845, at 34 (Austin, Mine & Cruger 1845), *available at*

19

http://tarlton.law.utexas.edu/constitutions/texas1845/journals. One of the suggested clauses protected an injured party's right to have "remedy by due course of law." *Id.* The other clause incorporated the criminal due course of law protections from Section 6 of the Republic's Declaration of Rights into a composite due course guarantee: "No citizen of this state shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disenfranchised, except by due course of the law of the land." *Id.* Thus, the committee's proposal added "life, liberty, property" to the existing due course of law guarantee, while removing the same phrase from the protections for the criminally accused. *Id.* The proposal also added "of this state" after the word "citizen." The proposal was ratified as Article I, § 16 of the Texas Constitution of 1845.

The language in the Due Course of Law Clause was not changed in the Texas Constitutions adopted in 1861, 1866, and 1869. *See* TEX. CONST. OF 1861, art. I, § 16; TEX. CONST. OF 1866, art. I, § 16; TEX. CONST. OF 1869, art. I, § 16. But the Constitutional Convention of 1875 reexamined the clause and proposed changing it to its current language. Comm. on Bill of Rights, *Journal of the Constitutional Convention of the State of Texas, Begun and Held at the City of Austin, September 6th, 1875*, *assembled* Oct. 2, 1875, at 274 (Galveston, News Office 1875), *available at* http://tarlton.law.utexas.edu/constitutions/texas1876/journals. The proposals were adopted, resulting in the clause reading as it now does. *See* TEX. CONST. art. I, § 19.

In 1873, two years before the convention that proposed the 1875 Texas Constitution, the United States Supreme Court interpreted the phrase "privileges or immunities" in the United States Constitution in the *Slaughter-House Cases*, 83 U.S. 36 (1873). There, several butchers challenged a Louisiana statute granting a single slaughtering company a monopoly on the butchering of animals

20

in New Orleans. *Id.* at 38-39. The statute was challenged under the Thirteenth and Fourteenth Amendments to the federal Constitution. *Id.* at 58-59. In rejecting the butchers' claims, the Court discerned a distinction in the text of the Fourteenth Amendment between the "privileges and immunities of citizens of the United States" and those of "citizens of the several states," and concluded that the Fourteenth Amendment protected only privileges and immunities which owed their existence to the federal government. *Id.* at 74, 78-79. It was the obligation of the states, according to the Supreme Court, to protect "privileges or immunities" founded in state citizenship, including even such fundamental rights as the right to acquire and possess property and to pursue and obtain happiness and safety. *Id.* at 74-78. Thus, discussions preceding proposal and adoption of the 1875 Texas Constitution were held against the backdrop of recent Supreme Court mandates placing guardianship of non-federal rights of individuals squarely in the hands of the states. *See* DEBATES IN THE TEXAS CONSTITUTIONAL CONVENTION OF 1875, 292 (Seth S. McKay ed., Univ. of Tex. 1930).

Ratification of the Fourteenth Amendment to the United States Constitution in 1868 seemed to hasten development of substantive due process jurisprudence. *See* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 354-56 (1868). The view in Texas was the same, as exemplified by cases such as *Milliken v. City Council of Weatherford*, 54 Tex. 388 (1881).[3] There the Court addressed a claim by Weatherford's mayor that he had been improperly removed from

---

[3] As to procedural due process relationships between the Fourteenth Amendment and Article I, § 19, see *City of Sherman v. Henry*, 928 S.W.2d 464, 472-73 & n.5 (Tex. 1996) (citing *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)), and *Mellinger v. City of Houston*, 3 S.W. 249, 252-53 (Tex. 1887).

21

office for violating a city ordinance that barred renting rooms to prostitutes without respect to whether the rooms were used for prostitution. *Id.* at 393. The Court concluded that the city could not prohibit prostitutes as a class from renting rooms because such action would be "unreasonable and in contravention of common right." *Id.* at 394. Although the Court did not mention "due course" or "due process" of law, its supporting citations included Article I, § 19. *See id.* And in *Houston & Texas Central Railway Co. v. City of Dallas*, 84 S.W. 648 (Tex. 1905), the Court considered the constitutionality of a municipal ordinance governing railroad crossing grades. The Court explained that

> it may often become necessary for courts, having proper regard to the constitutional safeguard . . . , to inquire as to the existence of the facts upon which a given exercise of the [police] power rests, and into the manner of its exercise, and if there has been an invasion of property rights under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary, and oppressive way, to give to the injured party that protection which the Constitution secures.

*Id*. at 653. In accord with decisions from the United States Supreme Court, this Court rejected the city's contention that a legislative judgment was conclusive. *Id.* at 653-54. The Court determined that the lower courts erred by upholding the ordinance without providing the railroad an opportunity to present evidence regarding the unreasonableness of the ordinance. *Id.*

Texas judicial decisions in the nineteenth and early twentieth century indicated that the Texas Due Course of Law Clause and the federal Due Process Clause were nearly, if not exactly, coextensive. Such decisions generally tracked the thinking expressed by the Court in *Mellinger v. City of Houston*, 3 S.W. 249, 252-53 (Tex. 1887), where the Court held that Article I, § 19 was not violated under the facts of that case because of the United States Supreme Court's interpretation of

the Fourteenth Amendment in a similar case. During this period, Texas courts frequently addressed whether a legislative enactment was a proper exercise of the governmental unit's police power, examining justifications for the enactment and typically relying on decisions from the United States Supreme Court as guidance. *See, e.g.*, *Mabee v. McDonald*, 175 S.W. 676, 680 (Tex. 1915) ("'Due process of law,' as used in the fourteenth amendment, and 'due course of the law of the land,' as used in Article I, § 19, of the Constitution of Texas, . . . according to the great weight of authority, are, in nearly if not all respects, practically synonymous."), *rev'd on other grounds*, 243 U.S. 90, 92 (1917) (holding that federal Due Process Clause was violated); *St. Louis Sw. Ry. Co. of Tex. v. Griffin*, 171 S.W. 703, 704-07 (Tex. 1914) (holding statute impairing corporation's right to discharge employees at will violated liberty of contract protected by both federal and state Constitutions); *Bruhl v. State*, 13 S.W.2d 93, 94-95 (Tex. Crim. App. 1928) (statute prohibiting non-optometrist merchant from assisting a customer in purchase of eyeglasses violated both Article I, § 19 and the Fourteenth Amendment). Occasionally, Texas courts mentioned that a proper review involved examining the enactment for a "real or substantial" relationship to the government's police power interest in public health, morals, or safety—a standard consistent with decisions of the United States Supreme Court. *See, e.g.*, *Ex parte Flake*, 149 S.W. 146, 148-50 (Tex. Crim. App. 1911) (quoting *Mugler v. Kansas*, 123 U.S. 623 (1887)).

As to federal due process standards, this period before 1935 is sometimes referred to as the "*Lochner* period" in reference to the United States Supreme Court's decision in *Lochner v. New York*, 198 U.S. 45 (1905). There, the Court considered a statute regulating the number of hours that bakers could work, enacted ostensibly for the purpose of protecting the health of bakers. *Id.* at 45-

23

47, 58. The Court determined that the legislatively declared purpose for an enactment could be disregarded by a court reviewing challenges to the statute and that

> [t]he purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose. . . .
>      . . . [T]his section of the statute . . . has no such direct relation to, and no such substantial effect upon, the health of the employee, as to justify us in regarding the section as really a health law.

*Id*. at 64. The Court held that the law was intended only "to regulate the hours of labor between the master and his employees" despite the legislature's stated purpose of concern for the health of bakers. *Id.* Because the Fourteenth Amendment did not permit such a regulation without a legitimate health and safety justification, the Court struck down the law. Justice Holmes, in dissent, advanced a much more deferential standard of review:

> We [have] said that the power of the courts to review legislative action in respect of a matter affecting the general welfare exists *only* when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law . . . . *If there be doubt as to the validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation. If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere.*

*Id.* at 68 (Holmes, J., dissenting) (emphasis added) (internal quotation marks omitted).

The Court remained within the bounds charted by *Lochner* for several years. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *N.Y. Life Ins. Co. v. Dodge*, 246 U.S. 357 (1918); *Truax v. Raich*,

24

239 U.S. 33 (1915); *Coppage v. Kansas*, 236 U.S. 1 (1915), *overruled in part by Phelps Dodge Corp. v. Nat'l Labor Relations Bd.*, 313 U.S. 177, 187 (1941); *Adair v. United States*, 208 U.S. 161 (1908), *overruled in part by Phelps Dodge Corp.*, 313 U.S. at 187.  Basically, then, during the "*Lochner* era," substantive due process was a touchstone by which courts analyzed both the purpose and the effect of governmental economic regulation by scrutinizing them with a somewhat equivocal deference to the legislative body's pronounced purpose for a law and its choice of the method embodied in the law to achieve that purpose.

The federal landscape changed in 1938.  In *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), the Supreme Court pronounced that

> regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis.

*Id.* at 152.  Ensuing federal decisions tracked *Carolene Products*' guidance that economic regulatory laws were presumed to be constitutional absent evidence or judicially known facts demonstrating that no rational basis existed for the regulation.  For example, in 1955 in *Williamson v. Lee Optical of Oklahoma, Inc.*, the Supreme Court explained that

> [t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.

348 U.S. 483, 488 (1955).

Texas courts were faced with the question of whether, after *Carolene Products*, to stay the course as to prior decisions interpreting Article I, § 19's due course of law provision, or follow the

25

lead of the United States Supreme Court as to the Fourteenth Amendment's Due Process Clause. That is, Texas courts had to decide whether "due process of law," as used in the Fourteenth Amendment, and "due course of law of the land," as used in Article I, § 19 of the Texas Constitution, remained "in nearly if not all respects, practically synonymous," or whether the meaning of the Texas Constitution remained the same as it had been earlier interpreted because the Constitution's language had not been amended through the political process. *See Mabee*, 175 S.W. at 680. As the parties to this case—and numerous Texas courts and commentators—have pointed out, the answer has not been made clear as to substantive due process challenges to governmental regulation of economic interests. As set out more fully above, the Threaders argue that in some cases this Court[4] as well as courts of appeals have continued using a less deferential, heightened-scrutiny standard of review, while in some cases different ones have been applied.

Following the lead of our prior jurisprudence, we conclude that the Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States Constitution. But, that having been said, the drafting, proposing, and adopting of the 1875 Constitution was accomplished shortly after the United States Supreme Court decision in the *Slaughter-House Cases* by which the Court put the responsibility for protecting a large segment of individual rights directly on the states. Given the temporal legal context, Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for

---

[4] *See, e.g.*, *Tex. Power & Light Co. v. City of Garland*, 431 S.W.2d 511, 517-20 (Tex. 1968) (holding ordinance must be reasonable exercise of city's police power, meaning ordinance must directly promote the general health, safety, welfare, or morals, and must have a "real and substantial" relation to such purpose); *State v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) (explaining it is essential that the police power "be used for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purposes for which it exists").

protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution. That burden has been recognized in various decisions of Texas courts for over one hundred and twenty-five years. We continue to do so today: the standard of review for as-applied substantive due course challenges to economic regulation statutes includes an accompanying consideration as reflected by cases referenced above: whether the statute's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest. *See, e.g.*, *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 938 (Tex. 1998) (stating that an ordinance "will violate substantive due process only if it is *clearly* arbitrary and unreasonable") (emphasis in original); *Garcia*, 893 S.W.2d at 525 (determining statute was "sufficiently *rational and reasonable* to meet constitutional due course requirements") (emphasis added); *Trinity River Auth.*, 889 S.W.2d at 264 (identifying statute as constitutional because it "strikes a *fair balance*" between the legislative purpose and rights of litigants) (emphasis added); *Hous. & Tex. Cent. Ry. Co.*, 84 S.W. at 653 (noting the constitutional inquiry was whether statute's effect was justified, or operated in "an unreasonable, arbitrary, and oppressive way"); *Milliken*, 54 Tex. at 394 (stating the constitutional inquiry was whether statute operated "unreasonabl[y] and in contravention of common right").

In sum, statutes are presumed to be constitutional. To overcome that presumption, the proponent of an as-applied challenge to an economic regulation statute under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not

27

arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.

To be clear, the foregoing standard includes the presumption that legislative enactments are constitutional, *e.g.*, *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968), and places a high burden on parties claiming a statute is unconstitutional. *See, e.g.*, *Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll., Inc.*, 454 S.W.2d 729, 732 (Tex. 1970). The presumption of constitutionality and the high burden to show unconstitutionality would apply as well to regulations adopted by an agency pursuant to statutory authority. *See Trapp v. Shell Oil Co.*, 198 S.W.2d 424, 428 (Tex. 1946). Although whether a law is unconstitutional is a question of law, the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties. *Garcia*, 893 S.W.2d at 520.

## C. Application: The Texas Cosmetology Statutes and Regulations

The Threaders do not contend that the State's licensing of the commercial practice of cosmetology is not rationally related to a legitimate governmental interest.[5] But they strongly urge that the number of hours of training required to obtain even an esthetician license has an arbitrary and unduly burdensome effect as applied to them because the 750-hour requirement has no rational connection to reasonable safety and sanitation requirements, which the State says are the interests

---

[5] The State has regulated the practice of cosmetology since 1935. *See* Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, 1935 Tex. Gen. Laws 304, 304-11, *repealed by* Act of May 13, 1999, 76th Leg., R.S., ch. 388, §§ 1, 6, 1999 Tex. Gen. Laws 1431, 2182-2206, 2439-40 (repealing former Act while also adopting the Occupations Code). The stated intent of the initial legislation was to "prevent the spreading of contagious and infectious diseases." *Id.* at 304, 311 (observing that the purpose of the Act was to "protect the public from inexperienced and unscrupulous beauty parlors and beauty culture schools" in response to the public being "daily exposed to disease due to insufficient care as to sanitation and hygiene").

underlying its licensing of threaders. In resolving the issue, we consider the entire record. *Garcia*, 893 S.W.2d at 520.

Several statutes address safety standards and sanitary conditions relating to cosmetology. *See* TEX. OCC. CODE §§ 1602.001, 1603.001. Commission rules also address public safety and sanitary conditions. *E.g.*, 16 TEX. ADMIN. CODE §§ 83.50(a), .53(a)-(b), .70(i), .71(b), .100-.115. To address competency of cosmetologists in Texas, the Legislature and Commission have imposed specific educational and training requirements for cosmetologists, estheticians, and salon operators. TEX. OCC. CODE §§ 1602.001, .254, .255, .257. To become a licensed esthetician, threaders must take at least 750 hours of instruction in a Commission-approved training program, *id.* § 1602.254(b)(3), and take State-prescribed practical and written examinations. *See* 16 TEX. ADMIN. CODE §§ 83.20(a)(6), .21(c), .21(e). Those training programs must devote at least 225 hours of instruction to facial treatments, cleansing, masking, and therapy; 90 hours to anatomy and physiology; 75 hours to electricity, machines, and related equipment; 75 hours to makeup; 50 hours to orientation, rules, and laws; 50 hours to chemistry; 50 hours to care of clients; 40 hours to sanitation, safety, and first aid; 35 hours to management; 25 hours to superfluous hair removal; 15 hours to aroma therapy; 10 hours to nutrition; and 10 hours to color psychology. *Id.* § 83.120(b). Commission-approved beauty schools are not required to teach threading techniques. The schools are required to provide 25 hours of instruction in superfluous hair removal, which encompasses threading, but individual schools decide which techniques to teach. The record reflects that fewer than ten of the 389 Commission-approved Texas beauty schools teach threading techniques, and only one of those devotes more than a few hours to them. Further, threading techniques are not required to be part of the mandated tests.

Both the practical and written tests are administered and scored by a third-party testing firm. The firm's testing guidelines show that the practical examination is an hour and thirty minutes in length and includes sanitation, disinfection and hair removal, but does not include threading, although a test-taker may *elect* to remove six hairs from the model's eyebrow using thread instead of tweezers during part of the exam. Nor does the written examination include questions as to threading techniques, although it includes globally relevant questions about sanitation, disinfection, and safety.

As shown above, of the 750 hours of required instruction for an esthetician license, 40 are required to be directly devoted to sanitation, safety, and first aid. *Id.* But in addition, hygiene and sanitation are covered as they relate to four other portions of the curriculum: facial treatment, anatomy, rules and laws, and superfluous hair removal. Hygiene and sanitation are also addressed in the written and practical licensing exams, along with other topics including disinfection and safety.

One argument the Threaders make, which at its core challenges the rationality of *any* required training, is that the unlicensed practice of eyebrow threading is simply not a threat to public health and safety. In support of the argument they reference their expert witness who submitted a report addressing all of the available medical literature on eyebrow threading, as well as her own empirical analysis of the technique's safety. Based on her investigation and professional experience with eyebrow threading, the expert concluded that threading is safe and, from a medical perspective, requires nothing more than basic sanitation training.

But the Threaders' expert also raised public health concerns during her testimony. She testified that threading may lead to the spread of highly contagious bacterial and viral infections,

including flat warts, skin-colored lesions known as mulluscum contagiosum, pink eye, ringworm, impetigo, and staphylococcus aureus, among others. She also agreed that failure to utilize appropriate sanitation practices—for example, proper use of disposable materials, cleaning of work stations, effective hand-washing techniques, and correct treatment of skin irritations and abrasions—can further expose threading clients to infection and disease.

Moving beyond the argument that threading does not pose health risks to begin with, the Threaders contend that as many as 710 of the required 750 training hours for an esthetician license are not related to properly training threaders in hygiene and sanitation, considering the activities they actually perform. The State argues that the Threaders greatly exaggerate the number of unrelated hours, but concedes that as many as 320 of the curriculum hours are not related to activities threaders actually perform.

Differentiating between types of cosmetology practices is the prerogative of the Legislature and regulatory agencies to which the Legislature properly delegates authority. And it is not for courts to second-guess their decisions as to the necessity for and the extent of training that should be required for different types of commercial service providers. But we note in passing that persons licensed to apply eyelash extensions—a specialty involving the use of chemicals and a high rate of adverse reactions—are required to undergo only 320 hours of training. *See id.* We also note that when the Threaders filed suit, hair braiders were required to undergo only 35 hours of training, 16 of which were in health and safety. *See id.* § 83.120(b). Hair braiding, however, has since been deregulated by the Legislature. *See* Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 1, sec.

31

1602.002(2), 1999 Tex. Gen. Laws 1431, 2186, *repealed by* Act of May 22, 2015, 84th Leg., R.S., H.B. 2717 (to be codified at TEX. OCC. CODE §§ 1601.003, 1602.003(b)(8)).

The fact that approximately 58% of the minimum required training hours are arguably relevant to the activities threaders perform, while 42% of the hours are not, is determinative of the aspect of the second prong of the as-applied standard which asks whether the effect of the requirements as a whole could be rationally related to the governmental interest. They could be. But the percentage must also be considered along with other factors, such as the quantitative aspect of the hours represented by that percentage and the costs associated with them when determining the other aspect of the second prong—whether the licensing requirements as a whole are so burdensome as to be oppressive to the Threaders. Where the number of hours required and the associated costs are low, the ratio of required hours to arguably relevant hours is less important as to the burdensome question. But its importance increases as the required hours increase. For example, if the statute and Commission's rules required ten hours of training for a threader to be licensed and 58 percent, or 5.8 hours, were arguably relevant to what threaders do, the burden of the irrelevant hours would weigh less heavily in determining whether the effect of the requirements as a whole on aspiring threaders is oppressive. In the case of the Threaders, however, the large number of hours not arguably related to the actual practice of threading, the associated costs of those hours in out-of-pocket expenses, and the delayed employment opportunities while taking the hours makes the number highly relevant to whether the licensing requirements as a whole reach the level of being so burdensome that they are oppressive.

The dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement and the number that would not. Even assuming that 430 hours (a number the Threaders dispute) of the mandated training are arguably relevant to what commercial threaders do in practice, that means threaders are required to undergo the equivalent of eight 40-hour weeks of training unrelated to health and safety as applied to threading. The parties disagree about the costs of attending cosmetology training required for a license to practice threading. The Threaders point to evidence that the cost averages $9,000. The State says the $9,000 cost is for private schools while public schools charge only $3,500. Given the record as to the number of hours of training required for subjects unrelated to threading, our decision neither turns on, nor is altered by, the exact cost. But the admittedly unrelated 320 required training hours, combined with the fact that threader trainees have to pay for the training and at the same time lose the opportunity to make money actively practicing their trade, leads us to conclude that the Threaders have met their high burden of proving that, as applied to them, the requirement of 750 hours of training to become licensed is not just unreasonable or harsh, but it is so oppressive that it violates Article I, § 19 of the Texas Constitution.

## IV. Response to the Dissents

The dissenting Justices say four things that bear responding to. First, they say that measuring the effects of the provisions by an "oppressive" standard is to measure it by no standard at all. *Post* at ___ (Hecht, C.J., dissenting); *post* at __ (Guzman, J., dissenting). The actuality of the matter is that the standard they propose for measuring the effects of the provisions is for all practical purposes no standard. The only way an enactment could fail the test the dissenters advocate is if the purpose

of the enactment were completely mismatched with—that is, it bore no rational relationship to—the provisions enacted to effect it. For example, assume in this case the record demonstrated conclusively, or the State conceded, that the Threaders are right and only 40 hours of the required training are relevant to safety and sanitation in performing threading. It would not matter under the CHIEF JUSTICE'S proposed standard. For under that standard, so long as at least some part of the required training could be rationally related to safety and sanitation, the entire 750 hours are rationally related because the provisions as a whole "might achieve the objective." *Post* at ___. The logical result of such standard would be that if the State were to require 1,500 or even more hours of training, the increased requirement would pass constitutional muster. Why is that so? Because if 40 hours of training might conceivably effect the Legislature's purpose and be constitutional, then any greater number that included that same 40 hours would also.

Second, the CHIEF JUSTICE references a small minority of other states that require threaders to be licensed either explicitly or by generally requiring licensing of those who commercially remove superfluous hair. *Post* at ___. But the Threaders neither contest the rationality of the State's requiring them to be licensed, nor the requirement that they take training in subjects such as sanitation and hygiene. What they contest is the excessiveness of the training requirements given the magnitude of the irrelevant training. And whether that excessive requirement violates the Texas Constitution is not determined by the relationship between other states' statutes and regulations and their respective constitutions.

Third, the CHIEF JUSTICE says that articulating and weighing factors such as the cost and relevance of the required training in considering the constitutionality of the provisions is "generally

34

referred to as legislating" and should not be done by judges, *post* at ___, and JUSTICE GUZMAN asserts that any line drawing in this case should be done by the Legislature, *post* at __. But providing standards for measuring the constitutionality of legislative enactments is not only a judicial prerogative—it is necessary in order to make the law predictable and not dependent on the proclivities of whichever judge or judges happen to be considering the case. Indeed, the dissenting Justices would reach the result they propose by measuring the licensing provisions against standards—the standards of "rational relationship" jurisprudence—just different standards. *Post* at ___. Expressing factors by which a statute's constitutionality is to be measured and by which we reach our decision is not legislating; it is judging and providing guidance for courts to use in future challenges to statutes or regulations, which history tells us will come.

Fourth, the CHIEF JUSTICE refers to rediscovering and unleashing "the *Lochner* monster" if legislative enactments are measured against a standard other than the rational relationship standard. *Post* at ___. But as discussed above, Texas courts, including this Court, have expressed and applied various standards for considering as-applied substantive due process claims for over a century. And it is those decisions on which the standards we set out today are based. Surely if those cases represented a "monster" running amuck in Texas, this Court would have long ago decisively dealt with it.

Courts must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and maintain a high bar for declaring any of them in violation of the Constitution. But judicial deference is necessarily constrained where constitutional protections are implicated.

35

## V. Conclusion

The provisions of the Texas Occupations Code and Commission rules promulgated pursuant to that Code requiring the individual Threaders to undergo at least 750 hours of training in order to obtain a state license before practicing commercial threading violate the Texas Constitution.

We reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings in accordance with this opinion.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 26, 2015