TEXAS ALCOHOLIC BEVERAGE COMMISSION and Adrian Bentley Nettles, in his official capacity as Executive Director of the Texas Alcoholic Beverage Commission, Appellants

v.

LIVE OAK BREWING CO., LLC; Revolver Brewing, LLC; and Peticolas Brewing Co., LLC, Appellees

NO. 03-16-00786-CV

Court of Appeals of Texas, Austin.

Filed: December 15, 2017

Mr. Michael P. Murphy, Assistant Solicitor General, Office of the Attorney General, P. O. Box 12548 (MC 059), Austin, TX 78711-2548, for Appellants.

Mr. Arif Panju, Institute for Justice, 816 Congress Avenue, Suite 960, Austin, TX 78701, Mr. Paul M. Sherman, 901 N. Glebe Rd., Suite 900, Arlington, VA 22203, Mr. Matthew R. Miller, Institute for Justice Texas Chapter, 816 Congress Ave Ste 960, Austin, TX 78701-2475, for Appellees.

Before Chief Justice Rose, Justices Pemberton and Goodwin

## OPINION

Melissa Goodwin, Justice

The Texas Alcohol Beverage Commission and its Executive Director [1] (collectively the Commission) appeal from the trial court's final judgment declaring that "Section 102.75(a)(7) of the Texas Alcoholic Beverage Code violates the Due Course of Law guarantees of article I, section 19 of the Texas Constitution" and permanently enjoining the Commission from enforcing the statute against appellees Live Oak Brewing Co., LLC; Revolver Brewing, LLC; Peticolas Brewing Co., LLC; "and all other producers of beer, ale, and malt liquor." For the following reasons, we reverse the trial court's final judgment and

render judgment in favor of the Commission.

## Background

### The Three-Tier System and the Beer Industry Fair Dealing Law

The alcoholic beverage industry in the State of Texas is regulated pursuant to a three-tier system that maintains "strict separation between the manufacturing, wholesaling, and retailing levels of the industry." *See* Tex. Alco. Bev. Code § 6.03 (describing history behind framework for distribution of alcoholic beverage products after Prohibition). Generally speaking, manufacturers of alcoholic beverages sell their product to distributors, distributors then sell the product within designated territories to retailers, and retailers then sell the product to the end consumer. Under this system, the members of the different tiers must remain independent from members of the other tiers, with the distributors acting as the middle-person in the alcoholic beverage supply chain. *See id.* § 102.01 (listing prohibited conduct between tiers).

The "public policy of this state" is "to maintain and enforce the three-tier system" and "thereby to prevent the creation or maintenance of a 'tied house.'" *Id.* § 6.03; *see id.* §§ 1.03 (stating that Texas Alcoholic Beverage Code is "exercise of the police power of this state for the protection of the welfare, health, peace, temperance, and safety of the people of this state"), 6.03 (explaining that one purpose of framework is to prevent organized crime). A "tied house" for these purposes means "any overlapping ownership or other prohibited relationship between those engaged in the alcoholic beverage industry

---

1. We have automatically substituted Adrian Bentley Nettles, the Commission's current Ex-

ecutive Director in his official capacity. *See* Tex. R. App. P. 7.2(a).

at different levels." *Id.* § 102.01; *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 321–22 (Tex. 2017) (explaining that "catalyst for the tied house provisions was a fear of returning to the state of affairs before Prohibition when tied houses played what was thought to be a substantial role in over-intoxicating society" and that "provisions are designed to prevent certain overlapping relationships between those engaged in the alcoholic beverage industry at different levels, or tiers"); *Neel v. Texas Liquor Control Bd.*, 259 S.W.2d 312, 316 (Tex. Civ. App.—Austin 1953, writ ref'd n.r.e.) (recognizing Texas Legislature's express determination that "liquor traffic in this State would be best controlled by keeping the various levels of the liquor industry independent of each other").

In addition to general provisions applying to the alcoholic beverage industry, specific provisions address the beer industry. Relevant to this appeal, holders of beer manufacturer licenses generally are required to "designate territorial limits in this state within which the brands of beer the licensee manufacturers may be sold by general, local, or branch distributor's licensees." Tex. Alco. Bev. Code. § 102.51(a). The manufacturer and distributor must enter into a written agreement "setting forth the sales territory within which each brand of beer purchased by that distributor may be distributed and sold," and a "manufacturer may not assign all or any part of the same sales territory to more than one distributor." *Id.* § 102.51(b). Once a distributor has been assigned a sales territory for a manufacturer's brand of beer, the distributor is required to maintain sufficient employees, storage facilities, delivery vehicles, and inventory to satisfy "the reasonable needs of all retailers in the assigned territory." *Id.* § 102.54. The stated purposes for these provisions concerning the distribution territorial limits on the sales

of beer are "to promote the public interest in the fair, efficient, and competitive distribution of beer, to increase competition in such areas, and to assure product quality control and accountability." *Id.* § 102.51(c).

The beer industry in Texas is also subject to the "Beer Industry Fair Dealing Law" (the Fair Dealing Law). *See id.* §§ 102.71–.82. The stated purpose of the Fair Dealing Law is "to promote the public's interest in the fair, efficient, and competitive distribution of beer within this state by requiring manufacturers and distributors to conduct their business relations so as to assure: (1) that the beer distributor is free to manage its business enterprise, including the right to independently establish its selling price; and (2) the public, retailers, and manufacturers are served by distributors who will devote their reasonable efforts and resource to the sales and distribution of all of the manufacturer's products which the distributor has the right to sell and distribute and maintain satisfactory sales levels in the sales territory assigned the distributor." *Id.* § 102.72(a).

Among the Fair Dealing Law's provisions, a party to a distribution agreement between a manufacturer and distributor cannot cancel the agreement except with notice and for "good cause." *Id.* § 102.74. Once obtained, a distributor can sell assigned territorial rights from a manufacturer to another distributor, and the manufacturer cannot "unreasonably withhold or delay its approval" of the assignment. *Id.* § 102.76. A manufacturer also cannot:

(1)  induce or coerce, or attempt to induce or coerce, any distributor to engage in any illegal act or course of conduct;

(2)  require a distributor to assent to any unreasonable requirement, condition, understanding, or term of an

agreement prohibiting a distributor from selling the product of any other manufacturer or manufacturers;

(3) fix or maintain the price at which a distributor may resell beer;

(4) fail to provide to each distributor of its brands a written contract which embodies the manufacturer's agreement with its distributor;

(5) require any distributor to accept delivery of any beer or any other item or commodity which shall not have been ordered by the distributor;

(6) adjust the price at which the manufacturer sells beer to a distributor based on the price at which a distributor resells beer to a retailer, but a manufacturer is free to set its own price so long as any price adjustment is based on factors other than a distributor's increase in the price it charges to a retailer and not intended to otherwise coerce illegal behavior under this section; or

(7) accept payment in exchange for an agreement setting forth territorial rights.

*Id.* § 102.75.

Section 102.75(a)(7)—the challenged statute here—was enacted in 2013 as part of a legislative package that addressed the craft beer brewing industry. *See* Act of May 20, 2013, 83d Leg., R.S., ch. 555, 2013 Tex. Gen. Laws 1494, 1494–95; *see also* Acts of May 20, 2013, 83d Leg., R.S., chs. 533–535, 2013 Tex. Gen. Laws 1443, 1443–1448. After expressly recognizing that "the three-tier system of regulating the alcoholic beverage industry is unquestionably legitimate," the Texas Legislature found that "the state is authorized to promote, market, and educate consumers about the emerging small brewing industry" and that "it is in the state's interest to encourage entrepreneurial and small business development opportunities in this state." *Id.* ch. 533, § 1, 2013 Tex. Gen. Law at 1443.

Among the other provisions that were enacted as part of the package, the statute authorizes small brewers and manufacturers of beer to self-distribute up to 40,000 barrels annually, *see id.* § 2 (to be codified at Tex. Alco. Bev. Code § 12A.02), ch. 534, § 2 (to be codified at Tex. Alco. Bev. Code § 62A.02), 2013 Tex. Gen. Laws at 1444–45, and to sell up to 5,000 barrels of beer annually directly to consumers on their premises, *see id.* ch 535, §§ 2, 3, 2013 Tex. Gen. Laws at 1447 (to be codified at Tex. Alco. Bev. Code §§ 12.052, 62.122).[2] Each of the bills in the package was written so as to take effect only if all of the bills in the package passed. *See id.* ch. 533, § 5; ch. 534, § 5; ch. 535, § 5; ch. 555, § 2, 2013 Tex. Gen. Laws at 1444, 1446–48, 1494–95.

**The Parties' Dispute**

Appellees are three Texas companies that brew ale and craft beer[3] and are holders of manufacturer's licences, brewer's permits, and self-distribution permits. *See* Tex. Alco. Bev. Code §§ 12.01 (requir-

---

**2.** For purposes of this appeal, there is no relevant difference between beer, ale, and malt liquor. *See* Tex. Alco. Bev. Code § 102.81 (applying provisions "to agreements concerning ale and malt liquor in the same manner as they apply to agreements concerning beer, and each particular class of permittee dealing with ale and malt liquor is subject to those provisions that apply to functionally corresponding licensees within the beer industry"). In this opinion, we generally refer to beer, ale, and malt liquor as "beer" and manufacturers and brewers as "manufacturers," unless otherwise stated.

**3.** According to appellees, " 'craft beer' ... can be loosely defined as full flavored beer, brewed using simple ingredients without artificial additives, with direct involvement by the brewery's owners."

ing brewer's permit for ale and malt liquor), 12A.01 (authorizing self-distribution permit for holder of brewer's permit), 61.01 (requiring license or permit to manufacture or brew beer), 62.01 (requiring manufacturer's license for beer), 62A.01 (authorizing self-distribution license for holder of manufacturer's license).

Appellees filed suit in 2014 seeking declaratory and injunctive relief against the Commission challenging the constitutionality of section 102.75(a)(7) based on the due course of law clause of the Texas Constitution.[4] *See* Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land."). They asserted that the statute violated "the [Texas] constitution's 'due process' guarantee"—"the right to earn an honest living in the occupations of one's choice free from unreasonable governmental interference." Specifically, appellees asserted that: (i) the Commission "violated the due process guarantee of the Texas Constitution by enforcing [the statute], which prohibits [appellees] from negotiating for the sale of their territorial rights"; (ii) the Commission "[has] no substantial, legitimate, or rational reason for prohibiting the sale of territorial rights by beer producers"; (iii) "[t]he state's police power

does not extend to regulating the terms of contract between two private businesses for no other reason than to transfer wealth from one business to another"; and (iv) the Commission "[is] presently and unconstitutionally requiring appellees to give away their territorial rights to distributors as a condition of transferring those rights." Among their requests for relief, appellees sought a permanent injunction barring the Commission from enforcing the statute against them and sought declaratory judgment that the Commission was "violat[ing] the due process guarantee of the Texas Constitution by unreasonably interfering with [appellees]' right to operate their businesses and contract freely on the open market."

The parties filed competing motions for summary judgment, responses, and replies joining issue on the constitutionality of section 102.75(a)(7). In its motion for traditional and no-evidence summary judgment, the Commission argued that it was entitled to summary judgment on appellees' due course of law claim because appellees could not carry their burden to establish that the statute's purpose was not rationally related to a legitimate government interest or that its "actual, real-world effect as applied to [appellees] could not arguably be rationally related to, or is so bur-

---

4. In its summary judgment rulings, the trial court ruled in favor of the Commission on a separate constitutional challenge that appellees brought under article I, section 17 of the Texas Constitution. *See* Tex. Const. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made."), (d) (stating that "all privileges and franchises granted by the Legislature, or created under its authority, shall be subject to the control thereof"); *see also* Tex. Alco. Bev. Code §§ 11.03 ("A permit issued under this code is a purely personal privilege and is subject to revocation as provided in this code. It is not property, is not subject to execution,

does not pass by descent or distribution, and except as otherwise provided in this code, ceases on the death of the holder."), 61.02(a) ("A license issued under this code is a purely personal privilege and is subject to revocation as provided in this code. It is not property, is not subject to execution, does not pass by descent or distribution, and ceases on the death of the holder."). Appellees have not appealed from that ruling. The trial court also dismissed their request for attorney's fees, and they have not appealed that ruling. Thus, we do not further address appellees' request for attorney's fees or their constitutional challenge brought under article I, section 17 of the Texas Constitution.

densome as to be oppressive in light of, the governmental interest." The Commission further argued that the statute was rationally related to the State's interest in maintaining the three-tier system and that it did not unreasonably interfere with appellees' "engaging in their chosen profession." In its response to appellees' motion for summary judgment, the Commission also argued that appellees had asserted only a facial challenge to the statute but that they had not attempted to carry the burden of showing that the statute was unconstitutional in all of its applications. Appellees countered in their motion for summary judgment that section 102.75(a)(7) did not further a governmental interest, the Commission already had the necessary tools to police undue influences or control between members of the difference tiers, and the statute existed "solely to enrich beer distributors at the expense of craft brewers."

Both parties filed evidence to support their competing motions, including the transcripts of depositions, legislative history, and discovery responses. The relevant evidence was undisputed.[5] Prior to the enactment of section 102.75(a)(7), appellee Live Oak Brewing was paid $250,000 for territorial rights for distribution in the Houston area, and the proceeds from the sale were used to purchase equipment and for expansion. Appellee Peticolas Brewing also was negotiating to sell territorial rights for distribution in the range of $300,000 but those negotiations ended after the bills addressing the craft beer industry were introduced. The evidence further showed that appellees had permits to self-distribute, none of them produced more than 125,000 barrels annually, and

they primarily self-distributed their beer but hoped to expand with their products being more widely available. At the time of the depositions of appellees' representatives, Peticolas Brewing was self-distributing everything it produced; Live Oak Brewing was self-distributing between 85 and 90 percent of its product with two distributors in the Houston area doing the rest; and Revolver Brewing was self-distributing approximately 94 percent of its product.

Following a hearing, the trial court signed the final judgment, declaring that section 102.75(a)(7) violates the due course of law guarantees of article I, section 19 of the Texas Constitution and permanently enjoining the Commission from enforcing the statute against appellees and "and all other producers of beer, ale, and malt liquor." The Commission filed a motion for new trial, which the trial court denied. This appeal followed.

## Analysis

The Commission raises three issues on appeal. The Commission denies appellees' assertion that the fundamental economic liberty interest recognized in *Patel v. Texas Department of Licensing and Regulation*, 469 S.W.3d 69 (Tex. 2015), applies to business interests like appellees. The Commission further argues that appellees failed to establish that section 102.75(a)(7) is facially unconstitutional, and that, even if appellees brought an as-applied challenge to the statute, they failed to prove that there was no rational basis for the statute or that is was unconstitutionally oppressive as applied to them.

---

5. The parties joined issue and filed evidence to support their competing positions about the legality of payments from distributors to manufacturers for territorial assignments prior to the enactment of section 102.75(a)(7). According to the Commission, these types of payments were not legal, but it only became aware of such payments in 2012. Appellees counter that manufacturers have been free to sell territorial rights for over eighty years. Resolution of this dispute, however, ultimately is unnecessary to our analysis.

**Standard of Review and Applicable Law**

██ The procedural posture of this appeal is from the trial court's summary judgment ruling, which we review de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). Summary judgment is proper if the moving party establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Joe*, 145 S.W.3d at 156–57. A movant seeking a no-evidence summary judgment must assert that "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact." *Id.* When, as here, both parties seek summary judgment on the same issue and the court grants one motion and denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented and, if we determine that the trial court erred, render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

██ The parties' dispute concerns the constitutionality of a statute, which we also review de novo. *See Patel*, 469 S.W.3d at 87. "Although whether a law is unconstitutional is a question of law, the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties." *Id.* (citing *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995)). Statutes are presumed to be constitutional, and a party challenging the constitutionality of a statute has a "high burden." *Id.*; *see* Tex. Gov't Code § 311.021(1) ("In enacting a statute, it is presumed that . . . compliance with the constitutions of this state and the United States is intended.").

██ The parties also join issue as to whether appellees brought an as-applied or facial challenge. "A facial challenge claims that a statute, by its terms, always operates unconstitutionally." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014) (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Garcia*, 893 S.W.2d at 518). "A party seeking to invalidate a statute 'on its face' bears a heavy burden of demonstrating that the statute is unconstitutional in all of its applications." *HCA Healthcare Corp. v. Texas Dep't of Ins.*, 303 S.W.3d 345, 349 (Tex. App.—Austin 2009, no pet.) (citing *Washington State Grange v. Washington State Repub. Party*, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)); *see Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 623 (Tex. 1996). " 'By contrast, an as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances.' " *Rivera*, 445 S.W.3d at 702 (citing *City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 240 (Tex. 2001); *Garcia*, 893 S.W.2d at 518 n.16). With these principles of law in mind, we turn to our analysis of the constitutionality of section 102.75(a)(7).

**Constitutionality of Section 102.75(a)(7)**

██ Appellees' challenge to section 102.75(a)(7) is based on the Texas Constitution's due course of law clause and fashioned after arguments recently evaluated by the Texas Supreme Court in *Patel*. *See* Tex. Const. art. I, § 19. Among the liberty interests protected by due course of law is freedom of contract, which includes the right to pursue a lawful occupation. *See*

*Patel*, 469 S.W.3d at 110, 123 (Willett, J., concurring) (observing that Texas Supreme Court "recognizes that Texans possess a basic liberty interest under Article I, Section 19 to earn a living" and describing economic liberty interest that was before court as "[o]ccupational freedom, the right to earn a living as one chooses"); *see also Mauldin v. Texas State Bd. of Plumbing Exam'rs*, 94 S.W.3d 867, 872 (Tex. App.—Austin 2002, no pet.) (recognizing that "right to work in a particular profession" is "protected right, but one subject to rational regulation" (citing *State v. Project Principle, Inc.*, 724 S.W.2d 387, 391 (Tex. 1987)); *Andrada v. City of San Antonio*, 555 S.W.2d 488, 491 (Tex. Civ. App.—San Antonio 1977, writ dism'd w.o.j.) (acknowledging that "liberty of contract is generally said to be part of that 'liberty' which is protected by due process clauses" but that "freedom of contract is a qualified, not an absolute, right" and that exercise of police power may prohibit "the making of future contracts").[6]

In their pleadings, appellees asserted that section 102.75(a)(7) was unconstitutional under "the [Texas] constitution's 'due process' guarantee" because it violated their "right to earn an honest living in the occupations of one's choice free from unreasonable governmental interference." In their argument to this Court, appellees also contend that they brought both facial and as-applied challenges to section 102.75(a)(7) based on their due course of law protections. We begin with appellees' as-applied challenge.

### As-applied Challenge

■ To support their position that the statute is unconstitutional as applied to them, appellees analogize their alleged constitutionally protected right to assign sales territorial rights for a cash payment to the protected economic liberty interest of occupational freedom that was at issue in *Patel*. In *Patel*, the plaintiffs were individuals who practiced commercial eyebrow threading and salon owners employing eyebrow threaders (the Threaders). 469 S.W.3d at 73. The Threaders had brought as-applied challenges based on the due course of law clause of the Texas Constitution to licensing statutes and regulations (the cosmetology scheme) that required 750 hours of cosmetology training, largely unrelated to commercial eyebrow threading, to obtain a license to practice. *Id.* at 73–74; *see* Tex. Const. art. I, § 19. Similar to appellees' claims, the Threaders alleged that the cosmetology scheme "violated their constitutional right 'to earn an honest living in the occupation of one's choice free from unreasonable government interference.'" *Patel*, 469 S.W.3d at 74.

The Texas Supreme Court concluded that the Threaders had met their "high burden" of proving that the cosmetology scheme was unconstitutional as applied to them based on the Texas Constitution due course of law protections. *See id.* at 90. In reaching its conclusion, the Texas Supreme Court set forth the following test for overcoming the presumption of constitutionality:

To overcome that presumption, the proponent of an as-applied challenge to an

---

6. *See also generally* David E. Bernstein, *The Due Process Right to Pursue a Lawful Occupation: A Brighter Future Ahead?*, 126 Yale L.J.F. 287 (Dec. 5, 2016); Clark Neily, *Beating Rubber-Stamps Into Gavels: A Fresh Look at Occupational Freedom*, 126 Yale L.J.F. 304 (Dec. 5, 2016); Joshua D. Hawley, *The Intellectual Origins of (Modern) Substantive Due Process*, 93 Tex. L. Rev. 275 (Dec. 2014); David N. Mayer, *Substantive Due Process Rediscovered: The Rise and Fall of Liberty of Contract*, 60 Mercer L. Rev. 563, 627–39 (Winter 2009) (discussing different facets of liberty of contract, including right to entry into lawful trades or occupations).

economic regulation statute under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.

*Id.* at 87. The court's analysis in its application of this test focused on the Threaders' constitutional right to occupational freedom and the State's concession that "as many as 320 of the curriculum hours [were] not related to activities that threaders actually perform." *See id.* at 89–90. The evidence showed that the Threaders were entirely shut out from practicing their trade until they completed the "oppressive" required training and that the threader trainees had to pay out-of-pocket expenses for that training "and at the same time lose the opportunity to make money actively practicing their trade." *Id.* at 88–90.

In contrast with the cosmetology scheme at issue in *Patel*, section 102.75(a)(7) addresses one aspect of the multi-faceted business relationship between beer distributors and manufacturers in the context of the three-tier system. Appellees' ability to assign a particular sales territory to a distributor arises from appellees' permits and licenses to manufacture beer in Texas and the requirement that manufacturers assign territorial rights to distributors under the comprehensive regulatory framework of the three-tier system. *See* Tex. Alco. Bev. Code §§ 11.01(a)(1) (requiring permit for privilege to "manufacture, distill, brew, sell, possess for the purpose of sale, ... transport, distribute, warehouse, or store liquor"), 12.01 (stating authorized activities for holder of brewer's permit),

61.01 ("No person may manufacture or brew beer for the purpose of sale, import it into this state, distribute or sell it, or possess it for the purpose of sale without having first obtained an appropriate license or permit as provided in this code.").

Appellees do not challenge the statutory requirements of permits and licenses for the privilege to manufacture beer in this state, and they have not challenged the three-tier system itself. *See Granholm v. Heald*, 544 U.S. 460, 489, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (recognizing that three-tier system for alcoholic beverage industry is "unquestionably legitimate"); *Neel*, 259 S.W.2d at 316 (affirming government's legitimate interest in preventing "evils of the 'tied house' "); *see also Dickerson v. Bailey*, 336 F.3d 388, 397 (5th Cir. 2003) (describing history of Alcoholic Beverage Code, including that it was enacted in 1935 after regulation of alcoholic beverages was returned to states). They also have not challenged any other provision addressing the relationship between manufacturers and distributors. *See, e.g.,* Tex. Alco. Bev. Code § 102.51(b).

Within the statutory framework of the three-tier system, the evidence showed that appellees have continued to operate their breweries and distribute their beer. Appellees have permits to self-distribute and have been doing so. *See id.* §§ 12A.02(a), (b) (authorizing self-distribution of up to 40,000 barrels directly to retailers for brewers producing fewer than 125,000 barrels annually), 62A.02(a), (b) (same authorization for manufacturers). The evidence further showed that, under the statutory framework, appellees are not required to "give away" sales territories to distributors. In addition to self-distributing their product, appellees can seek favorable provisions in the accompanying distribution agreement to a territorial rights as-

signment if they decide to assign territorial rights to a particular distributor. *See id.* § 102.75(b) (stating that "[n]othing in this section shall interfere with the rights of a manufacturer or distributor to enter into contractual agreements that could be construed as governing ordinary business transactions, including, but not limited to, agreements concerning allowances, rebates, refunds, services, capacity, advertising funds, promotional funds, or sports marking funds").[7] Thus, unlike the entry barrier faced by the Threaders in *Patel*, appellees have not demonstrated that section 102.75(a)(7) has deprived them of occupational freedom, i.e., that it has prevented them from operating within their chosen trade—brewing and selling beer—within the confines of the unchallenged three-tier system.

Appellees argue that the "true purpose" of section 102.75(a)(7) is "the illegitimate purpose of naked economic protectionism" of the distributors—a "naked transfer of wealth" aimed at "[e]nriching distributors at the expense of brewers" "with no public benefit whatsoever." *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 222–23 (5th Cir. 2013) (concluding that regulation that granted exclusive right to sell caskets to funeral homes was unconstitutional and explaining that "economic protection, that is favoritism may well be supported by a post hoc perceived rationale ... without which it is aptly described as a naked transfer of wealth"); *see also Patel*, 469 S.W.3d at 105 (Willett, J., concurring) (discussing Fifth Circuit's striking down of anticompetitive law in *Castille*).

As support for their position that the only purpose of section 102.75(a)(7) was to benefit distributors, appellees point to the evidence concerning the origins of section 102.75(a)(7) as part of the 2013 legislative package and to other provisions in the Code that already provided the Commission with "all of the tools it needed long before the passage of [section 102.75(a)(7) ] in 2013" to police improper influence or control between members of different tiers. *See* Tex. Alco. Bev. Code § 102.01 (expressly prohibiting "tied house"—"any overlapping ownership or other prohibited relationship" between members of different tiers—and specifically listing prohibited conduct of members of different tiers, including prohibiting member of one tier from providing credit or loans to member of different tier).

Appellees also rely on the evidence that territorial rights are "highly valuable," such as Live Oak Brewing's receipt of $250,000 for the assignment of territorial rights prior to the enactment of the statute.[8] Appellees argue, "[w]ithout the ability to convert distribution rights into investment capital, [their] ability to expand is diminished." And appellees rely on other provisions within the framework of the three-tier system that implicitly recognize that territorial rights for distribution have value, such as statutory limitations on cancellation of distribution agreements between manufacturers and distributors. *See id.* §§ 102.74 (requiring party to have "good cause" and to comply with notice

---

7. The summary judgment evidence included deposition testimony about the terms and considerations that are subject to agreement between a distributor and manufacturer, such as quality and quantity of the distributor's storage and the distributor's geographic reach, capacity for growth, the number of other beers that a distributor has assignment rights, and advertising issues.

8. As previously noted, the parties join issue on whether manufacturers were prohibited from receiving payment for sales territorial assignments prior to the enactment of section 102.75(a)(7). Because it is unnecessary to the disposition of this appeal, we expressly do not resolve this dispute.

requirements prior to cancelling agreement between manufacturer and distributor), 102.76 (allowing distributor to sell rights under distribution agreement to another distributor and, in that situation, prohibiting manufacturer from "unreasonably withhold[ing] or delay[ing] its approval"), 102.77 (requiring "reasonable compensation"—"fair market value of the distributor's business with relation to the affected brand or brands"—when manufacturer cancels distribution agreement without "good cause").

Even if we agree with appellees, however, that section 102.75(a)(7) directly benefits distributors at the expense of manufacturers and that territorial rights are valuable, we cannot conclude that prohibiting appellees from receiving a lump sum payment for the assignment of territorial rights equates with their deprivation of a constitutionally protected liberty interest such as that protected in *Patel. See Patel,* 469 S.W.3d at 91 (although recognizing that "judicial deference is necessarily constrained where constitutional protections are implicated," explaining "that Courts must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and maintain a high bar for declaring any of them in violation of the Constitution"); *see also Neel,* 259 S.W.2d at 318 (concluding that challenged statute within framework of three-tier system did not violate plaintiff's liberty of contract).

In determining the constitutionality of section 102.75(a)(7) as applied to appellees, we must consider it in the context of the statutory framework of the three-tier system within which appellees operate. *See Cadena,* 449 S.W.3d at 163 (considering and construing statute within "statutory and historical context" of Alcoholic Beverage Code and three-tier system); *see also, e.g., Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex. 2001) (holding that when construing statutes, courts "must always consider the statute as a whole rather than its isolated provisions"). Among the provisions that were enacted as part of the 2013 legislation package, manufacturers like appellees were authorized to self-distribute their product to retailers and to sell their product for on-site consumption to consumers. *See* Tex. Alco. Bev. Code §§ 12A.02(a), (b) (authorizing self-distribution up to 40,000 barrels for brewers producing fewer than 125,000 barrels of beer annually), 12.052 (authorizing sales by certain brewers to consumers for on-site consumption), 62A.02(a), (b) (authorizing self-distribution up to 40,000 barrels for manufacturers producing fewer than 125,000 barrels of beer), 62.122 (authorizing sales by certain manufacturers to consumers for on-site consumption). In contrast with section 102.75(a)(7), these provisions benefit appellees at the expense of distributors and retailers. Viewing the provisions in the legislative package as a whole, it becomes clear that they were the result of the type of commonplace compromise among various stakeholders that takes place as part of the legislative process.

Further, the provisions as a whole—providing offsetting benefits between the different tiers—conform with the statutory framework of the three-tier system that seeks to maintain balance between the tiers and preserve the viability and independence of each tier. *See, e.g., id.* §§ 6.03(i) (expressing policy of "strict separation between the manufacturing, wholesaling, and retailing levels of [alcoholic beverage] industry and thereby to prevent the creation or maintenance of a 'tied house'"), 102.51(c) (stating purpose for territorial limits was "to promote the public interest in the fair, efficient, and competitive distribution of beer, to increase competition in such areas, and to assure product quality control and accountability

by allowing manufacturers to assign sales territories within this state"); *Cadena*, 518 S.W.3d at 326–27, 330 (discussing "comprehensive framework for regulating everything from overlapping ownership among the three tiers down to specific financial transactions and gifts and promotions" and observing that "sheer number of statutes that Legislature enacted and the different approaches it took in proscribing the prohibited relationships, both specific and broad, reinforce its clear intent"); *S.A. Disc. Liquor, Inc. v. Texas Alcoholic Beverage Comm'n*, 709 F.2d 291, 293 (5th Cir. 1983) (explaining that three-tier system is intended to "avoid the harmful effects of vertical integration in the intoxicants industry" and "prevents companies with monopolistic tendencies from dominating all levels of the alcoholic beverage industry").

Because section 102.75(a)(7) is presumed constitutional, it was appellees' "high burden" to overcome the presumption and show that the statute as applied to them violated an economic liberty interest protected by the Texas substantive due course of law clause. *See Patel*, 469 S.W.3d at 87. We conclude that they failed to do so. Thus, to the extent that the trial court found section 102.75(a)(7) was unconstitutional as applied to appellees, we conclude that the trial court erred in its summary judgment ruling. On the same grounds, we also conclude that the trial court erred in denying the Commission's competing motion. *See Dorsett*, 164 S.W.3d at 661.

### Facial Challenge

To the extent that appellees also brought a facial challenge, we agree with the Commission that appellees failed to allege or meet the "heavy burden" to demonstrate that there was no set of circumstances under which section 102.75(a)(7) would operate constitutionally. *See Rivera*, 445 S.W.3d at 702; *HCA Healthcare*, 303 S.W.3d at 349, 351 (in context of appeal from summary judgment ruling, rejecting facial challenge because plaintiffs "[had] not argued, much less demonstrated," that statute operated unconstitutionally for every relevant medical dispute and rendering judgment that statute was facially constitutional); *see also FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000) (explaining that courts, in analysis of facial challenge to statute, "consider the statute as written, rather than as it operates in practice"). Our conclusion that section 102.75(a)(7) is not unconstitutional as applied to appellees is fatal to their facial challenge under the circumstances here.

Thus, to the extent that the trial court found section 102.75(a)(7) facially unconstitutional, we conclude that the trial court erred in its summary judgment ruling. *See Dorsett*, 164 S.W.3d at 661; *HCA Healthcare*, 303 S.W.3d at 351; *see also Gatesco Q.M. Ltd. v. City of Hous.*, 503 S.W.3d 607, 619–20 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (analyzing summary judgment ruling in context of challenge to statute based on due course of law clause after the Texas Supreme Court's opinion in *Patel* was issued).

### Conclusion

For these reasons, we reverse the trial court's final judgment and render judgment in favor of the Commission that appellees take nothing on their claims.