# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00039-CV

---

**Michael Garrett, M. D. and Kristin Held, M.D., Appellants**

**v.**

**The Texas State Board of Pharmacy, Ian Shaw, Bradley Miller, Donnie Lewis, Jenny Yoakum, Rick Fernandez, Daniel Guerrero, Lori Henke, Donna Montemayor, Julie Spier, Rick Tisch, and Suzette Tijerina, in their Official Capacities as members of the State Board of Pharmacy; Timothy Tucker, in his Official Capacity as the Executive Director of the Texas State Board of Pharmacy; the Texas Medical Board; Sherif Zaafran, Robert Martinez, Devinder S. Bhatia, James Distefano, Jayaram Naidu, Manuel Quinones, Satish Nayak, David Vanderweide, George De Loach, Kandace Farmer, Jason Tibbels, Sharon Barnes, Michael Cokinos, Robert Gracia, Tomeka Moses Herod, LuAnn Morgan, and Ebony Todd, in their Official Capacities as members of the Texas Medical Board; and Stephen Carlton, in his Official Capacity as the Executive Director of the Texas Medical Board, Appellees**

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-003686, THE HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellants Michael Garrett, M.D., and Kristin Held, M.D., (collectively "Doctors") appeal from the trial court's final judgment granting Appellees'[1] motion for summary

---

[1] Doctors named the following people as defendants in their official capacities: L. Suzan Kedron, Chip Thornsburg, and Dennis Wiesner as board members of the Texas State Board of Pharmacy; Allison Benz as executive director of the Texas State Board of Pharmacy; and Jeffrey Luna, Margaret McNeese, Karl Swann, Surendra Varma, Scott Holiday, Frank Denton, Linda Molina, and Timothy Webb as board members of the Texas Medical Board. Because those former officials no longer hold those positions, we automatically substitute their successors as parties. *See* Tex. R. App. P. 7.2(a) ("When a public officer is a party in an official capacity to an

judgment, denying Doctors' motion for summary judgment, and dismissing all of Doctors' claims with prejudice. For the following reasons, we affirm the trial court's final judgment.

## BACKGROUND

Texas regulates the pharmacy profession through the Texas Pharmacy Act, which "shall be liberally construed to regulate in the public interest the practice of pharmacy in this state as a professional practice that affects the public health, safety, and welfare." Tex. Occ. Code §§ 551.001, .002(a). Because "[i]t is a matter of public interest and concern that the practice of pharmacy merits and receives the confidence of the public and that only qualified persons be permitted to engage in the practice of pharmacy," *id.* § 551.002(b), pharmacists and pharmacies are subject to extensive regulations. A person must hold a license to practice pharmacy in Texas, and that license requires, among other things, graduating and obtaining a degree from a college of pharmacy, completing at least a 1,000-hour internship, and passing two examinations. *See id.* §§ 558.001, .051(a); *see also* 22 Tex. Admin. Code §§ 283.3–.4, .7 (Licensing Requirements for Pharmacists).[2]

The Texas State Board of Pharmacy (the "Pharmacy Board") has also adopted numerous administrative rules governing the actions and responsibilities of licensed pharmacists in Texas. *See* Tex. Occ. Code § 554.051(a) (providing that Board "shall adopt rules consistent with [the Texas Pharmacy Act] for the administration and enforcement of [that Act]"). For

_____

appeal or original proceeding, and if that person ceases to hold office before the appeal or original proceeding is finally disposed of, the public officer's successor is automatically substituted as a party if appropriate.").

[2] Rule citations are to the rules in effect as of 2019, when the operative petition was filed. All citations to Title 22 of the Texas Administrative Code are to rules promulgated by the Texas State Board of Pharmacy unless otherwise noted.

example, "[a] pharmacist shall exercise sound professional judgment with respect to the accuracy and authenticity of any prescription drug order dispensed." 22 Tex. Admin. Code § 291.29(a) (Professional Responsibility of Pharmacists). Among other things, licensed pharmacists are responsible for ensuring that medication "is dispensed and delivered safely and accurately as prescribed" as part of the dispensing process, which includes "drug regimen review and verification of accurate prescription data entry." *Id.* § 291.32(c)(1)(F) (Personnel). The "drug regimen review" includes reviewing the patient's medical record to identify clinically significant information (e.g., known allergies, adverse drug reactions, drug-drug interactions), and the pharmacist must take "appropriate steps to avoid or resolve the problem including consultation with the prescribing practitioner." *Id.* § 291.33(c)(2)(A) (Operational Standards). Pharmacists must also counsel patients regarding said prescriptions. *Id.* § 291.33(c)(1).

The purpose of those rules and the other provisions in the Texas Pharmacy Act "is to promote, preserve, and protect the public health, safety, and welfare through: (1) effectively controlling and regulating the practice of pharmacy; and (2) licensing pharmacies engaged in the sale, delivery, or distribution of prescription drugs and devices used in diagnosing and treating injury, illness, and disease."[3] Tex. Occ. Code § 551.002(c). Accordingly, a person is prohibited from dispensing or distributing non-controlled prescription drugs unless the person is a licensed pharmacist or otherwise statutorily authorized to dispense or distribute such medication. *See id.* § 558.001(c); *see also id.* §§ 158.001(b) (authorizing physician to dispense certain medication for "immediate need" but clarifying that provision "does not permit a physician to operate a

---

[3] Pharmacies are also separately licensed under the Texas Pharmacy Act. *See* Tex. Occ. Code § 560.001 (License Required). Numerous additional regulations control the operations of pharmacies within Texas. *See, e.g.,* 22 Tex. Admin. Code §§ 291.15 (Storage of Drugs), .17 (Inventory Requirements), .28 (Access to Confidential Records).

3

retail pharmacy without complying with Chapter 558"), .003(b) (dispensing of dangerous drugs in certain rural areas); 551.006 ("Notwithstanding any other law, a pharmacist has the exclusive authority to determine whether or not to dispense a drug."); 563.051(d) (clarifying that "immediate need" dispensing "does not authorize a physician or a person acting under the supervision of a physician to keep a pharmacy, advertised or otherwise, for the retail sale of dangerous drugs, other than as authorized under Section 158.003, without complying with the applicable laws relating to the dangerous drugs"), .053(b) (dispensing of dangerous drugs in certain rural areas); 22 Tex. Admin. Code §§ 169.2(10) (Tex. Med. Bd., "Rural Area" definition), 169.5 (Tex. Med. Bd., Exceptions). Collectively, these provisions are the "Dispensing Ban," which generally functions to prohibit persons, including physicians, from dispensing non-controlled prescription medication unless they are licensed pharmacists.[4] There are only three narrow exceptions permitting physicians to dispense such medication without a pharmacist license: (1) the 72-Hour Supply Exception, a three-day supply of medication "necessary to meet the patient's immediate needs," Tex. Occ. Code § 158.001(a); 22 Tex. Admin. Code § 169.2(6) (Texas Med. Bd., "Immediate needs" Definition); (2) the Free Sample Exception, medication samples provided to the physician free of charge, Tex. Occ. Code § 158.002(a); 22 Tex. Admin. Code § 169.5(2) (Texas Med. Bd., Exceptions); and (3) the Rural Exception, allowing physician to dispense medication at cost to patients if the physician practices

---

[4] Doctors have expressly sought relief from the Dispensing Ban to dispense "non-controlled prescription medication at cost," so we focus our analysis on that specific subset of medication. Generally, the relevant statutes and administrative rules comprising the Dispensing Ban concern "dangerous drugs," which includes any drug or device that is unsafe for self-medication and that is not included in specific penalty groups of the Texas Controlled Substances Act or has been designated by the Federal Drug Administration as a drug that requires a prescription. *See* Tex. Health & Safety Code § 483.001(2); Tex. Occ. Code § 551.003(12).

medicine in a narrowly defined rural area, Tex. Occ. Code § 158.003; 22 Tex. Admin. Code §§ 169.2(10) (Texas Med. Bd., "Rural area" Definition), 169.5(1) (Texas Med. Bd., Exceptions).[5]

Dr. Michael Garrett is an Austin-based family doctor who has practiced medicine for over 20 years. Dr. Garrett currently operates a "direct primary care" family practice, where patients pay a monthly fee for pre-agreed medical services rather than accepting insurance or other third-party payments. Dr. Kristin Held is a San Antonio-based ophthalmologist and surgeon who has practiced medicine for over 30 years. Dr. Held also does not take insurance or third-party payments. Both doctors desire to dispense non-controlled prescription medication at cost to their patients but are currently prohibited from doing so because they do not hold a pharmacist license nor qualify for the Rural Exception.

Doctors therefore brought the present lawsuit against the Pharmacy Board and the Texas Medical Board, as well as each boards' respective members and executive directors in their official capacities (collectively, the State), alleging that the Dispensing Ban (and its prohibition on their dispensing of non-controlled prescription medication at cost without a pharmacist license) violates their constitutional rights. Doctors argue that the Dispensing Laws violates their "rights to pursue a chosen business" protected by the Due Course of Law provision of the Texas Constitution. *See* Tex. Const. art. I, § 19. Doctors also allege that the distinction drawn between themselves and rural physicians who qualify for the Rural Exception violates

---

[5] The Rural Exception applies only "to an area located in a county with a population of 5,000 or less, or in a municipality or an unincorporated town with a population of less than 2,500, that is within a 15-mile radius of the physician's office and in which a pharmacy is not located," and that is not "adjacent to a municipality with a population of 2,500 or more." Tex. Occ. Code § 158.003(b).

their right to equal protection under the Texas Constitution. *See id.* art. I, § 3. Doctors therefore sought a permanent injunction against the State and attorneys' fees.

The parties filed cross-motions for summary judgment. After a hearing, the trial court granted the State's motion and denied Doctors' motion. Doctors timely appealed.

## STANDARD OF REVIEW

We review summary judgment rulings de novo. *Texas Alcoholic Beverage Comm'n v. Live Oak Brewing Co.*, 537 S.W.3d 647, 654 (Tex. App.—Austin 2017, pet. denied). To prevail on a motion for summary judgment, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). "When, as here, both parties seek summary judgment on the same issue and the court grants one motion and denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented and, if we determine that the trial court erred, render the judgment the trial court should have rendered." *Live Oak Brewing*, 537 S.W.3d at 654.

Moreover, we review de novo disputes concerning the constitutionality of a statute. *Id.* "Although whether a law is unconstitutional is a question of law, the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties." *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015).

## DISCUSSION

On appeal, Doctors contend that the trial court erred in failing to conclude that the Dispensing Ban violates their rights to due course of law and equal protection under the Texas Constitution. We address each in turn.

6

***Due Course of Law Challenge***

The Texas Constitution provides that "no citizen of this State shall be deprived of life, liberty, property, privileges or immunities or in any manner disenfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. A two-part test governs a Due Course of Law claim: (1) whether petitioners have a liberty or property interest that is entitled to procedural due process protection, and (2) if so, what process is due. *See Mosley v. Texas Health & Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019).

Here, the State does not dispute that Doctors are asserting a protected liberty interest "to engage in any of the common occupations of life." *See id.* (quoting *University of Tex. Med. Sch. At Houst. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)); *Live Oak Brewing*, 537 S.W.3d at 654 ("Among the liberty interests protected by due course of law is freedom of contract, which includes the right to pursue a lawful occupation."); *see also Texas Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 653 (Tex. 2022) (explaining that party must first show deprivation of interest protected by Due Course provision).

We therefore turn to the second step: what process is due to protect the asserted liberty interest. *See Mosley*, 593 S.W.3d at 264. Statutes, and the corresponding regulations adopted by an agency pursuant to statutory authority, are presumed constitutional. *Patel*, 469 S.W.3d at 87. The party making an as-applied challenge to an economic regulation under the Due Course of Law provision must make a showing under either of the two *Patel* prongs:

> (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or
>
> (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so

7

burdensome as to be oppressive in light of, the governmental interest.

*Id.* Doctors challenge the Dispensing Ban under both *Patel* prongs, and so we address each in turn.

### Patel *Rational Basis Challenge*

The State asserts, and the Doctors do not dispute, that it has a legitimate governmental interest: ensuring the safe dispensing of prescription medication in Texas. *See Texas State Bd. of Pharmacy v. Gibson's Disc. Ctr.*, 541 S.W.2d 884, 887 (Tex. App.—Austin 1976, writ ref'd n.r.e.). Instead, Doctors contend that the three purposes for the Dispensing Ban advanced by the State—(1) promoting safety by requiring a licensed pharmacist's independent review of a prescription before dispensing; (2) preventing potential conflicts of interest from physician dispensing the same medication they have prescribed; and (3) enabling effective regulation by limiting the number of dispensing locations—do not further that legitimate interest.

The State asserts that the Dispensing Ban satisfies the first *Patel* prong because requiring a licensed pharmacist to independently review a medication before dispensing it promotes safe dispensing, which is rationally related to its governmental interest. We agree. Pharmacists must meet strict requirements to be licensed, *see, e.g.*, Tex. Occ. Code §§ 558.001, .051(a); *see also* 22 Tex. Admin. Code §§ 283.3–.4, .7 (Licensing Requirements for Pharmacists), and part of their professional obligations includes completing "drug regimen reviews" where the pharmacist reviews a patient's medical records and takes steps to resolve any "clinically significant information" relating to a prescribed medication, 22 Tex. Admin. Code §§ 291.32(c)(1)(F) (Personnel), .33(c)(2)(A) (Operational Standards), .33(c)(1). Viewing the statute as a whole, it is clear that the Legislature has decided that having a pharmacist

8

doublecheck medication before dispensing would correct potential errors and improve the health and safety of patients. *See Bailey v. Smith*, 581 S.W.3d 374, 389 (Tex. App.—Austin 2019, pet. denied) (explaining that we "consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent" (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018));[6] Tex. Occ. Code § 551.002(c) (describing purpose of Texas Pharmacy Act as to "promote, preserve, and protect the public health, safety, and welfare" by "effectively controlling and regulating the practice of pharmacy"). Like the old proverb "two heads are better than one," the Legislature rationally could have determined that requiring two separate professionals—the prescribing physician and the dispensing pharmacist—to review medications promotes the safe dispensing of said medication in Texas. *See Mauldin v. Texas State Bd. of Plumbing Examn'rs*, 94 S.W.3d 867, 873 (Tex. App.—Austin 2002, no pet.) (explaining that "[a] legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data" (quoting *Heller v. Doe*, 509 U.S. 312, 320–21 (1993)); *see also* Sesame Street, *Two Heads Are Better Than One* (Sesame Street Inc. 1980).

Doctors argue that independent review by pharmacists does not further the governmental interest because some doctors may dispense medication without such oversight if they qualify under the statutory exceptions. *See* Tex. Occ. Code §§ 158.001(a) (72-Hour Supply Exception), .002(a) (Free Sample Exception), .003(c) (Rural Exception). But that argument is unavailing. Our review is not premised on "second guess[ing]" legislative policy choices. *See Hebert v. Hopkins*, 395 S.W.3d 884, 900 (Tex. App.—Austin 2013, no pet.). Even if a "perfect" or "superior" Dispensing Ban would not have such exceptions, generally requiring pharmacist

---

[6] "We further interpret administrative rules, like statutes, under traditional principles of statutory construction." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011).

9

review before dispensing is still rationally related to a legitimate governmental interest here.[7] *See Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 264 (Tex. 2002) ("The restriction clearly serves [the act's] purposes, and it is not for us to second-guess the Legislature's policy choices."); *cf. Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 685 (2012) (explaining that relevant determination is whether governmental action is "rational," not whether an alternative would have been "perfect" or "superior"). We cannot conclude that establishing a system which necessarily requires most prescribed medications to be doublechecked before dispensing "could not arguably be rationally related" to the uncontested legitimate governmental interest of ensuring safe dispensing of such medications. *See Patel*, 469 S.W.3d at 87.

That conclusion is strengthened when we consider the entire record before us.[8] *See id.* (explaining that as-applied challenge "in most instances require[s] the reviewing court to consider the entire record, including evidence offered by the parties"). In his report, Doctors' expert witness Dr. Mark Munger described his original research in prescriber dispensing; explained that 44 states allowed unrestricted dispensing by legally authorized prescribers as of 2013, and that patients reported an identical adverse drug reaction rate (ADR) of seven precent whether purchasing the medication from their prescriber or from a pharmacy; and opined that the

---

[7] Moreover, the argument ignores that the Dispensing Ban exceptions may be rationally related to other complementary, but sometimes competing, legitimate interests of the State.

[8] Doctors interpret the first *Patel* prong as requiring an as-applied challenge to the Dispensing Ban based on whether it is irrational "on its face" and the second *Patel* prong as requiring two separate analyses: the oppressiveness analysis used in *Patel* and *Live Oak Brewing*, *see Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015); *Texas Alcoholic Beverage Comm'n v. Live Oak Brewing Co.*, 537 S.W.3d 647, 659 (Tex. App.—Austin 2017, pet. denied), and an additional rational basis analysis of the Dispensing Ban's "actual, real-world effect." We do not construe *Patel*, and Doctors have not directed this Court to any authority interpreting *Patel*, as requiring this third independent analytical approach or otherwise treating it as distinct from the rational basis review under the first prong.

"current nationwide practice of prescribers dispensing is safe, that it is beneficial (both economically and medically) for patients, and that there is no reason to think the same would not be true in Texas or in the Plaintiffs' proposed dispensing practices." However, the underlying study "was not directed at detecting direct ADR risk from prescriber dispensing in contrast to the bi-provider system of dispensing medications" but instead relied on consumer patient self-reporting of experiencing an ADR. Furthermore, the same survey found that 64% of respondents strongly agreed that "having a physician/NP *and* pharmacist both check my medication makes it safer for me to take the medication." Similarly, other research in the record found that 1.6% of prescriptions contained errors detected by pharmacists and that pharmacists on average catch two prescription errors each day.

Dr. Munger also stated at his deposition that pharmacists receive "greater education in pharmacology." He also testified that involvement of pharmacists in dispensing medications "can increase medication adherence and reduce medication errors" and that pharmacists can have a role in "correcting errors contained in prescriptions from physicians." Dr. Munger and Allison Benz, former executive director of the Pharmacy Board, testified separately that pharmacists (and pharmacies) may also have software programs that compile patient's prescription histories, including prescriptions across multiple medical providers beyond just the prescribing physician.

Doctors point to affidavits and physician records demonstrating that they have safely dispensed medications under the Free Sample Exception for years and that rural doctors dispensing medications pursuant to the Rural Exception have done so without discipline. They also testified regarding examples in their own practices of pharmacists making errors in dispensing medication to Doctors' patients. But Dr. Garrett also testified that he receives calls

11

from pharmacists on an almost weekly basis, asking for clarifications about or raising potential concerns with prescribed medications; he further admitted that he has "infrequently" modified a prescription based on a pharmacist's call "a few times a year." Dr. Held similarly testified that she "[p]robably" received such calls, "would appreciate" such alerts from pharmacists, and she was "not saying I'm infallible. Everyone makes mistakes."

At most, Doctors have demonstrated that states have undertaken different approaches to regulating the dispensing of prescription medication, and that there may be benefits and detriments associated with either physicians or pharmacists having final authority over dispensing medication. But picking between such alternatives is a policy decision of the Legislature. *See Hebert*, 395 S.W.3d at 900; *cf. Mauldin*, 94 S.W.3d at 873 ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." (quoting *Heller*, 509 U.S. at 320–21)). Accordingly, Doctors have failed to satisfy the high burden of demonstrating that the Dispensing Ban on either Doctors specifically or doctors generally is not rationally related to the legitimate governmental interest of ensuring the safe dispensing of medication in Texas.[9] *See Patel*, 469 S.W.3d at 87.

### Patel *Oppressiveness Challenge*

Under the second *Patel* prong, Doctors contend that the actual, real-world effect of the Dispensing Ban is so burdensome as to be oppressive because it requires them to obtain a

---

[9] Because a rational relationship exists between ensuring independent review by pharmacists and the legitimate governmental interest in ensuring the safe dispensing of prescription medications, we need not address the other two asserted purposes. *See Mauldin v. Texas State Bd. of Plumbing Exam'rs*, 94 S.W.3d 867, 873 (Tex. App.—Austin 2002, no pet.) (explaining that "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it" (quoting *Heller v. Doe*, 509 U.S. 312, 320–21 (1993))).

pharmacist license to dispense prescription medication at cost. They analogize their circumstances to those of the eyebrow threaders in *Patel*, who would have had to undertake at least 320 hours of irrelevant training as part of an esthetician license to legally practice eyebrow threading in Texas. *See Patel*, 469 S.W.3d at 89; *see also Live Oak Brewing*, 537 S.W.3d at 656 (explaining that eyebrow threaders in *Patel* were "entirely shut out from practicing their trade" until they completed training, including paying for training and losing the opportunity to make money while actively practicing their trade). Here, Doctors complain that, just like in *Patel*, the Dispensing Ban requires them to attend pharmacy school, complete a 1,000-hour internship, and pass two exams before being allowed to dispense medication at cost. *See* Tex. Occ. Code § 558.051 (Qualification for [Pharmacist] License by Examination).

But *Patel* is inapposite. The record here is clear that Doctors are full-time physicians, who have been able to practice medicine successfully for decades in their chosen specialties. The Doctors are therefore clearly distinguishable from the eyebrow threaders in *Patel*, who faced a barrier of entry before they could even begin to legally practice their chosen profession. *See Patel*, 469 S.W.3d at 73 (explaining that commercial eyebrow threaders required esthetician license to legally practice their chosen profession) (citing Tex. Occ. Code § 1602.002(a)(8)). Doctors have not demonstrated that the Dispensing Ban has erected an entry barrier into their medical profession so as to deprive them of their occupational freedom. *See Transformative Learning Sys. v. Texas Educ. Agency*, 572 S.W.3d 281, 292–93 (Tex. App.— Austin 2018, no pet.) (rejecting Due Course challenge because challenged statute "does not impair an individual's ability to obtain a charter and establish an open-enrollment charter school" but rather only governs rights and obligations of recipients of state funding); *Live Oak Brewing*, 537 S.W.3d at 657 (rejecting constitutional challenge to statute prohibiting craft brewer from

13

accepting payment in exchange for territorial rights because statute did not prevent craft brewers "from operating within their chosen trade—brewing and selling beer—within the confines of the unchallenged three-tier system"). Nor have Doctors asserted any general challenge to the pharmacy licensing system within which the Dispensing Ban operates. *See* Tex. Occ. Code § 551.002(b) (stating legislative purposes of Texas Pharmacy Act is to ensure "that only qualified persons be permitted to engage in the practice of pharmacy" in Texas).

Doctors have instead relied on *Patel* in an attempt to expand the scope of their medical practice to include dispensing certain prescription drugs. But the Supreme Court has made clear that its holdings in *Patel* "must remain 'properly limited to the particular legal framework' in which they were made." *Transformative Learning*, 572 S.W.3d at 292–93 (quoting *Hegar v. Texas Small Tobacco Coal.*, 496 S.W.3d 778, 788 n.35 (Tex. 2016)). Accordingly, Doctors must, and have failed to, establish that the Dispensing Ban is "so burdensome as to be oppressive." *See Patel*, 469 S.W.3d at 87.

We conclude that the trial court did not err when it granted summary judgment in favor of the State and dismissed Doctors' Due Course of Law claim.

### Equal Protection Challenge

Doctors next contend that the trial court erred in failing to conclude that the Dispensing Ban violates their right to equal protection of the law because they are unable to dispense prescriptions at cost unlike doctors who qualify for the Rural Exception.[10] The Texas

---

[10] The State contends that Doctors lack standing to assert an equal-protection claim because the State interprets Doctors as specifically challenging the Rural Exception, which does not apply to them, and therefore any favorable judgment would not redress their injuries. *See Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 926 (Tex. App.—Austin

Constitution provides that all persons "have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Tex. Const. art. I, § 3.  A viable Equal Protection claim under the Texas Constitution requires Doctors to show they have been "treated differently from others similarly situated."  *See Klumb v. Houston Mun. Employees Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015) (quoting *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 647 (Tex. 2004)).  Doctors must then show "that the challenged [statute] is not rationally related to a legitimate governmental purpose."  *Id.* "In conducting a rational-basis review, we consider whether the challenged action has a rational basis and whether use of the challenged classification would reasonably promote that purpose." *Id.*  Such determinations are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

As previously discussed, the Dispensing Ban relates to a legitimate governmental interest—promoting the safe dispensing of medication—but Doctors complain that the Dispensing Ban makes an arbitrary distinction between them and other doctors who qualify for the Rural Exception.  Even assuming that Doctors are similarly situated to physicians who qualify for the Rural Exception, Doctors have failed to demonstrate that the Dispensing Ban (and its Rural Exception) are not rationally related to a legitimate governmental interest.  *See id.*

---

2010, no pet.) (stating that standing requires showing (1) concrete and particularized injury in fact; (2) fairly traceable to defendants' conduct, and (3) favorable judgment would redress injury).  But Doctors' equal-protection claim is premised on challenging the Dispensing Ban, not just the Rural Exception.  Based on the record before us, Doctors have demonstrated, and the State does not dispute, that they have standing to challenge the Dispensing Ban itself.  *See id.*

15

Doctors point to *Smith v. Decker*, 312 S.W.2d 632 (Tex. 1958) and *Jackson v. State*, 117 S.W. 818 (Tex. Crim. App. 1908), to argue that the "geographical location" distinction made by the Rural Exception is not rationally related to a legitimate governmental purpose. In *Smith*, the plaintiff challenged a law governing bail bonds that expressly prohibited parties from engaging in the business of making bail bonds without a license in counties containing cities between 73,000 and 100,000 inhabitants.[11] 312 S.W.2d at 635. The Supreme Court of Texas held that the disputed population limitation constituted the "use of population brackets alone to direct legislation toward a particular county needing a particular type of legislation." *See id.* Although the alleged basis for the licensing requirement was the "unprecedented increase in the number of forfeited recognizance and bail bonds in criminal cases and there were no adequate laws regulating the business of giving bail," the Texas Supreme Court found no reasonable relationship between this purpose and the rationale for limiting that licensing requirement only to that population bracket. *See id.* ("We can see no situation or circumstance with reference to the necessity of regulating the business of giving bail in counties [within that population bracket] that would be peculiar to such counties and not equally applicable to counties containing cities of more than 100,000 population."). However, *Smith* is distinguishable because there is a "situation or circumstance" here for treating rural doctors differently: the legitimate governmental purpose of promoting access to medications for persons who live in rural areas that have limited access to pharmacies. That a narrow exception exists for

---

[11] The law in question included a similar prohibition for counties containing a city of 350,000 inhabitants or more, but that portion was found invalid because the Act failed to include language necessary to make it effective. *See Smith v. Decker*, 312 S.W.2d 632, 637 (Tex. 1958).

a handful of rural doctors[12] does not negate the State's previously discussed purpose of ensuring the safe dispensing of medication; rather, it merely reflects the State's attempt to balance that interest with its separate (but related) interest in promoting access to medications for persons who live in rural areas that would otherwise have no or limited access to pharmacies. *Cf. Draper v. City of Arlington*, 629 S.W.3d 777, 792 (Tex. App.—Fort Worth 2021, pet. denied) (concluding multiple legitimate governmental purposes rationally related to challenged ordinances).

In *Jackson v. State*, the Texas Court of Criminal Appeals found a licensing requirement for barbers unconstitutional because it applied to all barbers except (1) students working as barbers to pay for school; (2) barbers at [charitable] institutions, and (3) barbers in towns with fewer than 1,000 people. 117 S.W. at 819. Again, however, the court emphasized that the expressly stated purpose of the licensing requirement—insuring better sanitary conditions and preventing the spread of disease—had equal applicability to all barbers and did not justify the exceptions. *Id*. at 820. The other cases cited by Doctors similarly involve geographic restrictions unrelated to a legitimate governmental purpose. *See Ex parte Baker*, 78 S.W.2d 610, 613–14 (Tex. Crim. App. 1934) (holding city ordinance unconstitutional because licensing fee applied to bakers from outside city limits had no public health or safety purpose); *Linen Serv. Corp. of Tex. v. City of Abilene*, 169 S.W.2d 497, 498 (Tex. Civ. App.—Eastland 1943, writ ref'd) (rejecting city ordinance requiring license for linen supply services located outside city limits because there was no contention that ordinance served legitimate governmental interest).

---

[12] Evidence in the record shows that only three to eight of the more than 64,000 doctors within the State of Texas may have dispensed medication pursuant to the Rural Exception.

17

Unlike the geographic restrictions in the cases cited by Doctors, the Dispensing Ban and the Rural Exception are rationally related to legitimate governmental purposes. Although the effect of the Dispensing Ban and the Rural Exception is that Doctors are treated differently from a handful of rural physicians when it comes to dispensing medication, that does not change that the Rural Exception is rationally related to and reasonably promotes the State's interest in ensuring access to medications in rural areas with limited pharmaceutical facilities. *See Klumb*, 458 S.W.3d at 13. Accordingly, we conclude that the trial court did not err when it granted summary judgment in favor of the State and dismissed Doctors' Equal Protection claim.[13]

## CONCLUSION

For these reasons, we affirm the trial court's final judgment.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: January 25, 2023

---

[13] Doctors also complain that the trial court erred in sustaining evidentiary objections made by the State and, consequently, striking certain evidence from the summary-judgment record. That evidence is not necessary for resolving the issues before this Court, but even if the trial court had considered the excluded evidence, the trial court did not err in granting summary judgment in favor of the State. Consequently, we need not decide this issue.